UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAGUE OF INDEPENDENT
FITNESS FACILITIES AND
TRAINERS, INC., BASELINE
FITNESS LLC, BUILDING
YOUR TEMPLE LLC,                                No. 20-cv-00458
BYT FITNESS 247 LLC,
CLAWSON FITNESS, LLC,                           HON. PAUL L. MALONEY
CLINTON FITNESS, INC.,
D-LUX KARATE UNIVERSITY,
LLC, FENTON ATHLETIC CLUB,                      **DEFENDANTS' RESPONSE**
INC., FENTON KARATE, LLC,                       **TO PLAINTIFFS' MOTION**
FUSION FITNESS 24/7 LLC,                        **FOR PRELIMINARY**
H3 FITNESS LLC, I FITNESS                        **INJUNCTION**
PERSONAL TRAINING, INC.,
JKP FITNESS, LLC, JPF
ENTERPRISES, LLC, M FITNESS
CLUB, LLC, MH & AB LLC,
MOTOR CITY CF – ST. CLAIR
SHORES, LLC, NASCOT
ENTERPRISES, LLC, PRISON CITY
PHYSIQUE, LLC, FMP FITNESS INC.,
STRENGTH BEYOND LLC, 24/7
BOOTCAMP AND BOXING, INC., and
4 SEASONS GYM, LLC,

     Plaintiffs,

v

GRETCHEN E. WHITMER and
ROBERT E. GORDON,

     Defendants.

---

Scott M. Erskine (P54734)              John G. Fedynsky (P65232)
Carly Van Thomme (P59706)              Andrew J. Jurgensen (P81123)
Erskine Law, P.C.                      Joseph T. Froehlich (P71887)
Attorneys for Plaintiffs               Joshua O. Booth (P53847)
612 W. University                      Christopher M. Allen (P75329)
Rochester, MI 48307                    Assistant Attorneys General

(248) 601-4499                          Attorneys for Defendants
serskine@erskinelaw.com                 Michigan Dep't of Attorney General
cvanthomme@erskinelaw.com               State Operations Division
                                        P.O. Box 30754
                                        Lansing, MI 48909
                                        (517) 335-7573
                                        fedynskyj@michigan.gov
                                        jurgensena2@michigan.gov
                                        froehlichj1@michigan.gov
                                        boothj2@michigan.gov
                                        allenc28@michigan.gov

**DEFENDANTS WHITMER AND GORDON'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

John G. Fedynsky (P65232)
Andrew J. Jurgensen (P81123)
Joseph T. Froehlich (P71887)
Joshua O. Booth (P53847)
Christopher M. Allen (P75329)
Assistant Attorneys General
Attorneys for Defendants
Michigan Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
fedynskyj@michigan.gov
jurgensena2@michigan.gov
froehlichj1@michigan.gov
boothj2@michigan.gov
allenc28@michigan.gov

Dated:  June 12, 2020

# TABLE OF CONTENTS

Page

Table of Contents ............................................................................................... i

Concise Statement of Issues Presented ........................................................... ii

Controlling or Most Appropriate Authority ................................................... iii

Introduction ....................................................................................................... 1

Statement of Facts ............................................................................................. 4

Standard  for Preliminary Injunction ............................................................... 9

Argument ......................................................................................................... 10

I. Plaintiffs' claims are not justiciable. .............................................. 10

   A. Plaintiffs lack standing to bring their pre-enforcement claims. .......... 10

   B. Plaintiff LIFFT lacks organizational standing. .................................... 11

II. Plaintiffs are not likely to succeed on the merits. ............................ 12

   A. The States have wide latitude in dealing with great dangers to public health. ...................................................................................... 12

      1. *Jacobson v. Commonwealth of Massachusetts* ........................... 13

      2. Application of *Jacobson* to the current health crisis and the restrictions challenged by Plaintiffs. ................................... 18

   B. Plaintiffs do not have a viable procedural due process claim .............. 24

   C. Plaintiffs do not have a viable equal protection claim ......................... 26

   D. Plaintiffs do not have a viable dormant commerce clause claim. ........ 29

III. Plaintiffs make an inadequate showing of irreparable harm. ....................... 31

IV. A preliminary injunction would not serve the public interest. ...................... 32

Conclusion and Relief Requested ................................................................... 33

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Do Plaintiffs present justiciable claims?

2.      Are Plaintiffs likely to succeed on the merits of their due process, equal
protection, and dormant commerce clause claims?

3.      In the absence of a preliminary injunction, will Plaintiffs suffer
irreparable harm?

4.      Will a preliminary injunction serve the public interest?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>*Authority*</u>:

*Chafin v. Chafin*, 568 U.S. 165 (2013).

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993).

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905).

*Mathews v. Eldridge*, 424 U.S. 319 (1976).

*McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016).

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

## INTRODUCTION

In a pandemic involving person-to-person spread of a novel, potentially fatal virus that spreads easily and aggressively, particularly through respiratory droplets, does it make sense to restrict indoor fitness activity?  By its nature, such activity – sustained heavy breathing, common ventilation, sharing of equipment and other objects and spaces – significantly increases the risk of spread.  Thus, it makes eminent sense to restrict this activity.

Under settled law, the government may temporarily restrict commercial activity when sufficient public health concerns take priority.  The seriousness of the current pandemic is beyond dispute.  The temporary nature of the narrow restrictions that Plaintiffs have challenged in this case is also undisputed.  Plaintiffs' claims should fail for lack of standing, including lack of organizational standing for the lead Plaintiff.  This Court should deny preliminary injunctive relief for those reasons alone.

On their merits, Plaintiffs' claims fare no better.  Claims similar to those raised by the Plaintiffs have already been evaluated and rejected as unlikely to be successful on the merits in other federal courts as well as the Michigan Court of Claims.  The Court of Claims' reasoned analysis applies just as well in this case, recognizing the significant judicial deference due to the reasonable and temporary measures challenged here.[1]

---

[1] *Martinko, et. al. v. Governor Whitmer, et. al.,* Michigan Court of Claims Case No. 20-62-MM, April 29, 2020 Opinion and Order Denying Plaintiffs' Motion for a Preliminary Injunction, p. 14 (Attached as Exhibit A).

It is well established that, "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 27 (1905). To that end, "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." *Id*. at 26. As Chief Justice Roberts reasoned in a case concerning a regulation issued to address the COVID-19 pandemic, the broad authority given to and duly exercised by state officials should not be "subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay United Pentecostal Church v. Gavin Newsom, Governor of California*, 509 U.S. ___ (2020) slip op., p. 2 (summary order released May 29, 2020) (Roberts, C.J., concurring) (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)). (Exhibit B.)

The well-settled rule of law from *Jacobson* permits a state, in times of public health crises, to reasonably restrict the rights of business and individuals alike in order to secure the safety of the community. The scourge of COVID-19—a novel virus that quickly spread across the entire planet, infecting millions, and killing over four hundred thousand—presents such a crisis. Jurisdictions across the globe have had to take action to ensure that healthcare systems are not overwhelmed. Schools were shuttered, gatherings postponed, and business operations curtailed.

Michigan is one of the states hardest hit by the pandemic.  As of June 11, 2020, there have been 65,449 persons confirmed infected and 5.985 have died, all in about three months.  There is no dispute that in the absence of any vaccine, social distancing has been the most effective way to combat the virus and keep these numbers from escalating.  Recognizing this, Defendant Governor Gretchen Whitmer and Director Robert Gordon have taken bold, yet reasonable and necessary, steps to prioritize social distancing in Michigan.

In a series of executive orders, Governor Whitmer exercised her authority under Michigan law to put measures in place to suppress the spread of the virus and protect the public health.  The restrictions that Plaintiffs challenge here are part of this broader network of response efforts to suppress the spread of COVID-19, protect the State's health care resources from rapid depletion, and avoid many needless deaths.  As a result of these restrictions, countless lives have been saved, the curve of the virus's spread has been flattening, and the Governor has been able to gradually and correspondingly lift a number of the previously imposed restrictions—including the very ones challenged here.

The judicial creation of exceptions to these public health measures on a case-by-case, piecemeal basis infringes on the state's authority to act in a public health crisis and threatens its overarching plan to cope with the dangers and protect the lives and welfare of all Michiganders.  Even if they were justiciable, the claims Plaintiffs raise lack merit and they should be dismissed.

## STATEMENT OF FACTS

**The nature of the COVID-19 pandemic.**

The facts surrounding the COVID-19 pandemic are well established.  SARS-CoV-2 is similar to other coronaviruses (a large family of viruses that cause respiratory illnesses), but the strain is novel.  There is no general or natural immunity built up in the population (meaning everyone is susceptible), no vaccine, and no known treatment to combat the virus itself (as opposed to treatment to mitigate its symptoms).

It is widely known and accepted that COVID-19, the disease that results from the virus, is highly contagious, spreading easily from person to person via "respiratory droplets."[2]  Experts agree that being anywhere within six feet of an infected person puts you at a high risk of contracting the disease.[3]  But even following that advice is not a sure-fire way to prevent infection.  The respiratory droplets from an infected person can land on surfaces, and be transferred many hours later to the eyes, mouth, or nose of others who touch the surface.  Moreover, since many of those infected experience only mild symptoms, a person could spread the disease before he even realizes he is sick.  Most alarmingly, a person with

---

[2] World Health Organization, *Modes of transmission of virus causing COVID-19*, available at https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations.  (Attached as Exhibit C).

[3] Centers for Disease Control, *Social Distancing, Quarantine, and Isolation*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.  (Attached as Exhibit D).

COVID-19 could be not yet symptomatic, but still spread the disease.[4]  Everyone is vulnerable either as a potential victim of this scourge or a carrier of it to a potential victim.

Because there is no way to immunize or treat for COVID-19, the Centers for Disease Control and Prevention have indicated the best way to prevent illness is to "avoid being exposed."[5]  And as experience from prior pandemics such as smallpox and the 1918 Spanish Influenza indicates, early intervention to slow COVID-19's transmission is critical.

In keeping with this advice, governmental entities have stressed the critical import of "social distancing," the practice of avoiding public spaces and limiting movement.[6]  The objective of social distancing is what has been termed "flattening the curve," that is, reducing the speed at which COVID-19 spreads.  If the disease spreads too quickly, the limited resources of our healthcare system could easily become overwhelmed.[7]

On March 10, 2020, in response to the growing pandemic in Michigan, Governor Whitmer declared a state of emergency and invoked the emergency

---

[4] (*Id.*)

[5] (*Id.*)

[6] (*Id.*)

[7] *See New York Times, Flattening the Coronavirus Curve* (March 27, 2020), available at https://www.nytimes.com/article/flatten-curve-coronavirus.html. (Attached as Exhibit E).  Take Italy, for example, where the healthcare system was so overloaded in just three weeks of dealing with the virus that it could not treat all patients infected, essentially leaving some to die.

powers available to the Governor under Michigan law.[8]  On March 13, 2020, Governor Whitmer issued Executive Order 2020-5, prohibiting assemblages of 250 or more people in a single shared space with limited exceptions, and ordering the closure of all K-12 school buildings.[9]  Yet, even in the face of the social distancing recommendations and the six-foot rule, on Saturday, March 14, the public was out in droves.

On March 16, 2020, the Governor ordered various places of public accommodation, like restaurants, bars, and exercise facilities, to close their premises to the public.[10]  And on March 17, 2020, the Governor issued an order rescinding Executive Order 2020-5, changing the cap on assemblages to fifty persons in a single shared indoor space, and expanding the scope of exceptions from that cap.[11]

**The Governor issues and continually revises Stay Home orders to stem the tide of COVID-19 infections.**

On March 23, 2020, Governor Whitmer issued Executive Order 2020-21, which essentially ordered all persons not performing essential or critical infrastructure job functions to stay in their place of residence, other than to obtain groceries, care for loved ones, engage in outdoor activity consistent with social

---

[8] E.O. No. 2020-4, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html.  (Attached as Exhibit F).

[9] E.O. No. 2020-5, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521595--,00.html.  (Attached as Exhibit G).

[10] E.O. No. 2020-9, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521789--,00.html.  (Attached as Exhibit H).

[11] E.O. No. 2020-11, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521890--,00.html.  (Attached as Exhibit I).

distancing, and other limited exceptions.[12]  The order also prohibited, with limited exceptions, all public and private gatherings of any number of people that are not part of a single household.[13]

Over the weeks that followed, the Governor reissued that Stay Home order periodically, adjusting its scope as needed and appropriate to match the ever-changing circumstances presented by this pandemic.  The complementary restrictions on access to certain places of public accommodation also remained in place.[14]

On June 1, 2020, the Governor issued another executive order, E.O. 2020-110, (Exhibit K), which continued the incremental and data-driven reopening of the State by rescinding the latest iterations of the Stay Home and public-accommodations orders – E.O.s 2020-69 and 2020-96 – and replacing their restrictions with narrower and more permissive limitations on certain gatherings, events, and businesses.  This order leaves in place the restriction that certain places

---

[12] E.O. No. 2020-21, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html.  (Attached as Exhibit J).
[13] (*Id.*)
[14] *See* E.O. Nos. 2020-42, 2020-59, 2020-70, 2020-77, 2020-92, and 2020-96 (Stay Home orders); 2020-20, 2020-43, and 2020-69 (public accommodations orders). Alongside these executive orders, Director Gordon, acting pursuant to his authority under MCL 333.2253, issued emergency orders concluding that COVID-19 had reached epidemic status in Michigan and that the measures imposed in the Stay Home orders and certain related executive orders were necessary to control the epidemic and protect the public health.  The first of these emergency orders was issued on April 2, 2020, with subsequent versions rescinding and replacing the prior versions of the order issued May 18, 2020 and May 21, 2020.  As presented, Plaintiffs' challenges appear directed primarily at the Governor's executive orders and only nominally against Director Gordon's April 2 Order.

of public accommodation – including indoor gyms, fitness centers, and the like, as well as indoor entertainment and recreational facilities such as trampoline parks, climbing facilities, dance halls, and the like – remain "closed to ingress, egress, use, and occupancy by members of the public."  It also, however, makes clear (as the prior public-accommodations orders did) that employees of these businesses were permitted on site, and further provides that the following outdoor services and activities were permitted:

> Outdoor fitness classes, athletic practices, training sessions, or games, provided that coaches, spectators, and participants not from the same household maintain six feet of distance from one another at all times during such activities, and that equipment and supplies are shared to the minimum extent possible and are subject to frequent and thorough disinfection and cleaning.

E.O. 2020-110(14)(a). In addition, the order does not prevent gyms and similar businesses from offering online and certain in-home services to their clients, or from selling products via delivery, curbside pickup, or at outdoor classes and the like.

On June 5, 2020, the Governor issued E.O. 2020-115, (Exhibit L), which lifted many restrictions in Regions 6 (northern Lower Peninsula) and 8 (Upper Peninsula), including on indoor fitness activity, permitting gyms and similar businesses to fully resume in-person operations subject to certain safety measures. In taking this next step toward reopening, the Governor noted that these two regions of the State "have significantly fewer new cases [of COVID-19] per million each day than other regions in the state and have not shown an increase in viral activity in response to earlier relaxations of my orders."  (E.O. 2020-115, Preamble.) Subject to her ongoing assessment of statewide data and the advice of public health

experts, the Governor has publicly stated that her goal is to be in a position to take this same step with the rest of the State by July 4, 2020.

**Plaintiffs and the claims for which they seek preliminary injunctive relief.**

Plaintiff League of Independent Fitness Facilities and Trainers, Inc. ("LIFFT") is a non-profit organization based in Wayne County, with about 400 members, of which at least 130 operate a fitness facility.  (First Am. Compl., ¶ 10.) The remaining twenty-two Plaintiffs are individual fitness industry businesses that operate at least one location in Michigan.  (Pl.'s Br. at 1, Page ID.267.)  For purposes of preliminary injunction relief, they rely on the following claims:

1.  procedural due process,

2.  equal protection, and

3.  dormant commerce clause.[15]

Threshold issues of justiciability stand in the way of each of these claims.  And on their merits, each theory of constitutional violation is unfounded.  For the reasons stated below, denying preliminary injunctive relief is appropriate.

## STANDARD  FOR PRELIMINARY INJUNCTION

In deciding whether to grant a preliminary injunction, a court weighs four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3)

---

[15] The first amended complaint includes additional claims (substantive due process, privileges and/or immunities, void for vagueness, and the declaratory state law claims) that Plaintiffs omitted from their arguments in support of a preliminary injunction.

whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012).

Importantly, "[t]he party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success," and faces a "much more stringent [standard] than the proof required to survive a summary judgment motion" because a preliminary injunction is "an extraordinary remedy." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).  It is "reserved only for cases where it is necessary to preserve the status quo until trial." *Hall v. Edgewood Partners*, 878 F.3d 524, 526 (6th Cir. 2017).

### ARGUMENT

Here, not only do the traditional factors weigh against providing the Plaintiffs with a preliminary injunction, but, as an initial matter, there also are threshold jurisdictional and prudential legal reasons not to grant such relief.  In particular, standing is lacking because of the pre-enforcement posture of this case. And the lead Plaintiff lacks organizational standing.

## I.    Plaintiffs' claims are not justiciable.

### A.    Plaintiffs lack standing to bring their pre-enforcement claims.

To have Article III standing, a plaintiff must have a personal stake in the outcome of a controversy, and that stake must be in the form of an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  An allegation of future injury may suffice only if the threatened injury is "certainly

impending," or there is a "'substantial risk' that the harm will occur." *Id.* And as the Supreme Court has made clear, when—as here—the merits of a constitutional question pit the judiciary to pass on the constitutionality of the other branches of government, the standing inquiry is "especially rigorous." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Plaintiffs bring their claims in a pre-enforcement posture. As such, to satisfy the "injury-in-fact" requirement of Article III standing, they must allege (1) an intention to engage in the conduct they claim is unconstitutionally proscribed and (2) a credible threat of prosecution. *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016). Here, Plaintiffs have alleged neither. In fact, Plaintiffs commendably acknowledge that they have not violated the orders and give no reason to believe that they intend to. Plaintiffs' standing cannot the "especially rigorous" scrutiny that applies to their claims. *Clapper*, 568 U.S. at 408. As a result, Plaintiffs lack of Article III standing.

### B.   Plaintiff LIFFT lacks organizational standing.

For additional reasons, the lead Plaintiff LIFFT lacks standing. An organization can establish standing two ways. First, it may assert "organizational standing" on its own behalf because it has suffered a palpable injury as a result of the defendants' actions. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002). Second, an organization may claim standing as a representative of its members who would have standing to sue individually. *Id.*

Here, LIFFT primarily alleges derivative injuries based on claims about its members. It alleges no direct injury coupled with a causal connection between the

injury and the executive orders.  As a result, any claim of injury is conjecture and insufficient to establish standing.

Further, regardless of whether LIFFT is asserting standing on its own behalf or on behalf of its members, LIFFT, for the reasons already discussed, has failed to allege facts sufficient to establish the injury-in-fact requirement for the pre-enforcement claims it seeks to bring.  As a result, LIFFT lacks standing.  *See Loren v. Blue Cross & Blue Shield of Michigan*, 505 F.3d 598, 607 (6th Cir. 2007) ("If Plaintiffs cannot establish constitutional standing, their claims must be dismissed for lack of subject matter jurisdiction.")

## II.  Plaintiffs are not likely to succeed on the merits.

Even if Plaintiffs' claims were justiciable, they fail to state any viable claim for relief.  First, the restrictions in the Governor's executive orders are a proper exercise of the authority given to the States to combat a public health crisis.  Second, even if the Court were not evaluating the claims under the deferential standard set forth in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), but instead under a more standard analysis of the alleged constitutional violations, the restrictions pass muster.

### A.  The States have wide latitude in dealing with great dangers to public health.

The worldwide impact of COVID-19 is recognized by all.  Such an extraordinary circumstance requires extraordinary governmental measures.  The measures taken in the Governor's executive orders were necessary to meet the

demands of these extraordinary times and are reasonable and constitutional. Accordingly, judicial invalidation of those orders is not warranted.

### 1.     *Jacobson v. Commonwealth of Massachusetts*

Faced with "great danger[ ]," state actors are permitted great latitude to secure the public health. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905). And in this time of crisis, securing the public health requires temporary sacrifices by each of us: "Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others." *Id*. at 26.

In *Jacobson*, the U.S. Supreme Court considered a claim that the state's mandatory vaccination law, which applied to every person in Cambridge, Massachusetts, due to a growing smallpox epidemic, violated the defendant's Fourteenth Amendment right "to care for his own body and health in such way as to him seems best." *Jacobson,* 197 U.S. at 26. The Supreme Court upheld this sweeping, invasive measure as a proper exercise of the States' police power because of the exigencies and dangerousness of the public health crisis. It affirmed that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. As the Court stated,

> in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Jacobson*, 197 U.S. at 29.

*Jacobson* even highlighted the circumstance, without hesitation, in which seemingly healthy people were quarantined against their will aboard a ship on which others had cases of serious diseases. *Id.* at 29. The Court noted that such a drastic measure was reasonable "until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared." *Id.* Recognizing the separation of powers, and the limits on the judiciary to invade the authority of a co-equal branch, the Court refused to "usurp the functions of another branch of government" by second-guessing the executive's exercise of police power in such circumstances. *Id.* at 28.

Of course, constitutional rights do not disappear in the face of a public health crisis, but the analysis of the government's action changes. Review is "only" available if the challenged action "has *no real or substantial relation to those objects* [of securing public health and safety], or is, *beyond all question, a plain, palpable invasion of rights secured by the fundamental law.*" *Id.* at 31 (emphasis added).

*Jacobson*'s principle is no outlier. *See*, *e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *Compagnie Francaise de Navigation a Vapeur v. La State Bd of Health*, 186 U.S. 380, 393 (1902) (upholding Louisiana's right to quarantine even apparently healthy passengers aboard a vessel over a due process challenge).

And *Jacobson* not only remains good law, *see, e.g.*, *Kansas v Hendricks*, 521 U.S. 346, 356 (1997) (block quoting *Jacobson* in support of the proposition that "an

14

individual's constitutionally protected interest in avoiding physical restraint may be overridden even in the civil context"), but federal circuits have recently had occasion to apply *Jacobson* to COVID-19-related regulations, upholding certain restrictions that burden a fundamental right. *See, e.g., In re Abbott*, 954 F.3d 772, 786 (5th Cir., April 7, 2020) ("*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency.") (emphasis in original); *In re Rutledge*, 956 F.3d 1018 (8th Cir., April 22, 2020).[16]

Recently, the Sixth Circuit has confirmed that *Jacobson* is the proper starting point for considering restrictions promulgated in response to the COVID-19 crisis that touch upon constitutional rights. *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020). In those cases, the

---

[16] Numerous other federal courts across the country have recognized that *Jacobson* is the proper starting point for considering restrictions promulgated in response to the COVID-19 crisis that touch upon constitutional rights. And those courts have routinely held, across a wide range of challenges, that state actions like those at issue here were an appropriate and constitutional response to the scourge of COVID-19. *See, e.g., Open Our Oregon v. Brown*, No. 6:20-CV-773-MC, 2020 WL 2542861 (D. Or. May 19, 2020); *Amato v. Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788 (D. Conn. May 19, 2020); *Geller v. de Blasio*, No. 20CV3566 (DLC), 2020 WL 2520711 (S.D.N.Y. May 18, 2020); *McGhee v. City of Flagstaff*, 2020 WL 2308479 (D. Ariz., May 8, 2020); *Givens v. Newsom*, 2020 WL 2307224 (E.D. Cal., May 8, 2020); *SH3 Health Consulting, LLC v. St. Louis County Exec.*, 2020 WL 2308444 (E.D. Mo., May 8, 2020); *Cross Culture Christian Center v. Newsom*, 2020 WL 2121111 (E.D. Cal., May 5, 2020); *Lighthouse Fellowship Church v. Northam*, 2020 WL 2110416 (E.D. Va., May 1, 2020); *Shows v. Curtis*, 2020 WL 1953621 (W.D. N.C., April 23, 2020); *Gish v. Newsom*, 2020 WL 1979970 (C.D. Cal. April 23, 2020); *Robinson v. Attorney General*, 957 F.3d 1171 (11th Cir. April 23, 2020); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020); *Lawrence v. Colorado*, No. 120CV00862DDDSKC, 2020 WL 2737811 (D. Colo. Apr. 19, 2020); *Legacy Church, Inc. v. Kunkel*, 2020 WL 1905586 (D. N.M. April 17, 2020).

Court determined that despite the very deferential standard of *Jacobson*, the Plaintiffs were likely to succeed on the merits of their claims challenging a complete abortion ban in Tennessee and a total ban on group religious services in Kentucky.

Quite plainly, the restrictions considered by the Sixth Circuit in *Adams & Boyle*, *Maryville Baptist Church, Inc.*, and *Roberts* were different in kind and severity than the limited and temporary (and now partially rescinded) restrictions challenged by the Plaintiffs in this case. Unlike those cases, this case does not involve a complete ban on the exercise of fundamental constitutional rights. Instead, the Plaintiffs challenge temporary and partial restrictions on certain commercial activity—none of which comes close to plainly or palpably invading a fundamental right beyond all question, and all of which had a real and substantial relation to stopping the spread of the virus, preventing the overwhelming of this state's health care system, and avoiding needless deaths.[17]

Recently, the U.S. Supreme Court refused to grant injunctive relief for a party challenging under the First Amendment a California executive order that created limitations on public gatherings, including those of public worship, based on

---

[17] It is also worth noting that Governor Whitmer's orders have not sought to place restrictions on the fundamental constitutional rights asserted by the Plaintiffs in *Adams & Boyle* and *Maryville Baptist Church, Inc.* – abortion and free exercise of religion. And when courts have evaluated constitutional challenges of the sort at issue here – i.e., to restrictions on business activities – they have consistently rejected those challenges. *See, e.g.*, *Open Our Oregon v. Brown*, No. 6:20-CV-773-MC, 2020 WL 2542861 (D. Or. May 19, 2020); *Amato v. Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788 (D. Conn. May 19, 2020); *SH3 Health Consulting, LLC v. St. Louis County Exec.*, 2020 WL 2308444 (E.D. Mo., May 8, 2020); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020).

considerations of health and safety.  *South Bay United Pentecostal Church, et al. v. Gavin Newsom, Governor of California*, 509 U.S. ___ (2020) (summary order released May 29, 2020).  In his opinion concurring in the denial of relief, Chief Justice Roberts expressly relied on *Jacobson* in explaining that the Constitution "principally entrusts" these questions of safety to "the politically accountable officials of the States."  *Id.* at slip op., p. 2 (citing *Jacobson*, 197 U.S. at 38). Notably, as here, when those officials act "in areas fraught with medical and scientific uncertainties," Chief Justice Roberts explained that "their latitude 'must be especially broad.'"  *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).  And when operating within those broad limits, he explained, these officials "should not be subject to second-guessing" by the federal judiciary, which lacks comparable expertise in public health.  *Id.* (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).)

There is no viable path for Plaintiffs around *Jacobson*'s well-settled rule of law.  Plaintiffs cannot dispute the gravity of the pandemic in Michigan.  It is a once-in-a-century kind of epidemiological public health crisis caused by a potentially fatal virus that remains easily transmittable and still lacks adequate treatment, let alone a vaccine.  In such times, the State has wide plenary authority to temporarily restrict activity that presents a diffuse but real threat to the public health.

Thus, under *Jacobson* and applicable principles of separation of powers, judicial deference to the Governor's authority responding to the crisis is paramount.

Indeed, the Michigan Court of Claims has recognized as much in denying a motion for a preliminary injunction.  As so aptly stated by the Michigan Court of Claims:

> The role courts play under *Jacobson* and *Lansing Bd of Ed* is not to "second-guess the state's policy choices in crafting emergency public health measures," *In re Abbott*, 954 F3d at 784, but is instead to determine whether the state regulation has a "real or substantial relation to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Id.*, quoting in part *Jacobson,* 197 US at 31. Part of this review includes looking to whether any exceptions apply for emergent situations, the duration of any rule, and whether the measures are pretextual.  *Id.* at 785.

(Ex A, p. 11.)  As will be discussed in more detail, Plaintiffs' claims cannot survive this settled standard.  Therefore, they are not likely to succeed.

### 2.    Application of *Jacobson* to the current health crisis and the restrictions challenged by Plaintiffs.

Plaintiffs allege the they should be permitted as a matter of constitutional law to resume their indoor fitness business activities.  This claim plainly fails under *Jacobson*'s duly deferential review.

Under *Jacobson*, in the face of the current public health crisis, the Governor's executive orders are entitled to great deference, despite any impingement on individual rights, and must be upheld unless there is "no real or substantial relation" to the public health crisis, or the orders were, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."

With this standard in mind, *Jacobson* requires that the Governor's challenged executive orders be upheld in their entirety.  While the impact of any restriction on some aspect of normalcy outside of a pandemic is no doubt important, the restrictions are temporary and in specific response to a widespread public

18

health crisis.  The Court should view each restriction through the lens of the general public health justifications and the over-arching and urgent goal of limiting the spread of this novel virus.  A myopic, activity-specific framing of any issue is not a proper part of the analysis.  Appropriate understanding of the nature of the pandemic and the four corners of the executive orders is adequate to the task before the Court.

While no line-drawing is immune to disagreement, judicial deference is owed to the Governor's assessment of how to most effectively limit the spread of the virus while not unduly restricting life-sustaining activity and services.  That assessment has included consideration of the temporary nature of any restriction and what as a general matter could be endured while flattening the curve and then containing the virus's spread.

The point is not to imagine how each specific activity of daily life might be accomplished safely by using social distancing and other recommended prophylactic measures.  In a drought, where the point is to avoid uncontrolled wildfires, there can be no allowance for those who promise to be really careful with their campfire. In a deadly pandemic such as this, the point—the necessity—is to only allow those risks to public health that can and must be taken; the stakes are too high to do otherwise.

To wit, a simple trip to an indoor fitness business for a workout might appear both innocuous and inoculated for purposes of the virus.

But appearances are deceiving.  Customers and employees all share space, breathe the same air, and touch common surfaces.  For these factors, the context of an indoor fitness facility is critical.  Why?  Because even the most ventilated indoor facility is susceptible to respiratory spread of the virus.  The danger is only amplified when people congregate (even with social distancing) in a confined space and work out.  By its nature, working out is sustained vigorous physical activity, which necessarily means heavy breathing and sweating and, therefore, acute, propulsive bursts of virus shedding by anyone in that confined space who might be infected.[18]  Apart from individual exercisers in proximity, there is the added risk of individuals working out together or organized groups working out for extended trainer-led sessions.  And the risk of viral spread is only heightened further by the sharing of exercise equipment among many different people over the course of the day, even when good-faith efforts are made to clean that equipment after each use.

At a fitness center, these factors merge to significantly increase the incidence of this highly contagious and asymptomatically transmittable virus spreading.  Like innumerable small breezes against a sail, enough will push a sailboat over a waterfall if the course is not changed and the sail not brought under control.  Use of

---

[18] *See* CDC Research Paper, *Cluster of Coronavirus Disease Associated with Fitness Dance Classes, South Korea*, available at https://wwwnc.cdc.gov/eid/article/26/8/20-0633_article; *see also USA Today, Is group exercise safe? Study raises questions about coronavirus risk in gyms* (June 5, 2020), available at https://www.today.com/health/coronavirus-group-exercise-are-classes-safe-coronavirus-risk-gyms-t183428 (summarizing South Korea study of 112 infections linked to fitness dance classes at twelve gyms); *New York Times*, *Is It Safe to Go Back to the Gym?* (May 13, 2020), available at https://www.ytimes.com/2020/05/13/well/move/coronavirus-gym-safety.html

personal protective equipment (PPE), sanitizers, and the like will only do so much to avoid these harms and presents the downside of depleting resources critically needed to provide emergency care to those afflicted by COVID-19 and other conditions immediately threatening their health and safety.

This last point merits emphasis. Until recently, Michigan, like other states, had been in the throes of an impending and dangerous shortage of health care resources available to handle the steep and immediate demands created by this pandemic, from PPE for medical professionals (and other critical infrastructure workers), to ventilators and other necessary medical supplies, to hospital beds. As the virus began to ravage the State, health systems were quickly reaching or exceeding their capacity. Medical supplies were dwindling, and beds in intensive care units were in short supply. There was a very real and imminent danger that hospitals could be completely overrun. Indeed, the TCF Center (formerly Cobo Center) – typically the home of auto shows and black-tie galas – was retrofitted as a makeshift field hospital in anticipation of local bed shortages.[19] That it has not seen thousands of patients is a blessing, and a result of the carefully calibrated measures put in place to stem the tide.

---

[19] Detroit Free Press, *TCF Center transformation ahead of schedule, ready for patients April 8* (April 4, 2020), available at https://www.freep.com/story/news/local/michigan/2020/04/04/coronavirus-covid-19-tcf-center-field-hospital/2948726001/

Accordingly, there is ample good reason to temporarily regulate fitness centers, as the executive orders challenged here do.[20]  And there is ample good reason for those regulations to remain in place longer than those that restrict activity that does not pose the same level of risk of infection and spread—such as activity that is outdoors or more sedentary or isolated. The restrictions at issue serve to protect the public health of the State and its residents, and to prevent its health care system from collapsing under the strain of easily transmittable, potentially fatal, and still untreatable virus.  They—like the broader set of measures regarding travel and in-person work and activities that were put in place by the Governor's emergency orders—are temporary, tailored, and aimed at guiding the state as swiftly and safely as possible through the severe dangers posed by this pandemic.

Plaintiffs complain that the restrictions they challenge are lasting too long. But adequate time must be given for the public health goals to be served and a transition to economic normalcy to return—and due deference must be given under *Jacobson* to the Governor's assessment and actions in that regard.[21]  *See, e.g., South Bay United Pentecostal Church*, 509 U.S. ___ (Roberts, C.J., concurring in summary

---

[20] Plaintiffs refer to an alleged national absence of any outbreak connected to a fitness center.  Even if true, that would only stand to show the effectiveness of the lockdown orders and social distancing practices.  It would not imply the absence of a rational basis to order the temporary shutdown of indoor commercial fitness activity.

[21] The incubation period of the virus and its duration of contagion are other important variables not yet fully understood.  Accordingly, a variable dial approach to reopening should be preferred over the flipping of a switch that Plaintiffs' legal position might suggest.

denial order) (explaining that "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and the judgment of "the politically accountable officials" to whom those decisions are entrusted "should not be subject to second-guessing" by the courts).

And indeed, this careful and gradual transition is exactly what has been happening with the rescission of various executive orders and the promulgation of new, narrower ones. While circumstances rapidly escalated and the virus began to ravage the State, more restrictive measures were necessary to combat the spread and save lives. As circumstances have improved and the number of infections and deaths have trended downward, the restrictive measures have eased, sometimes on a regional basis, based on the best available data and the advice of public-health experts. This is the very essence of the emergency management authority afforded the Governor under the principles announced in *Jacobson*.

Judicial deference is appropriate not just on the substance of this challenge but the timing as well. As a matter of separation of powers, distinctions between essential and non-essential and safe and unsafe are best left to the branch designed for and equipped to make those calls. The Governor's executive orders should not be undercut by disparate preliminary judicial carveouts in the wake of a particular litigant's race to the courthouse.

In sum, the limited and temporary restrictions in the Governor's orders have been necessary and appropriate, with a "real [and] substantial relation" to stopping

the spread of the virus, and they most certainly do not constitute, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 US at 31. As stated by the Michigan Court of Claims:

> What the Court must do—and can only do—is determine whether the Governor's orders are consistent with the law. Under the applicable standards, they are.

(*Martinko* Opinion, Ex A, p. 14, citation omitted). Accordingly, Plaintiffs cannot overcome *Jacobson* and their claims fail as a matter of law.

## B. Plaintiffs do not have a viable procedural due process claim.

The same is true of Plaintiffs' claims even absent *Jacobson*'s deferential standard. First, Plaintiffs have failed to state a viable procedural due process claim. The general touchstone for such claims is notice and an opportunity to be heard on a pre- or post-deprivation basis. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976). But under the holding of *Mathews*, none of the instant Plaintiffs have suffered a final deprivation of any protected interest. The challenged executive orders contain temporary restrictions, not final ones. Additionally, *Mathews* concerned termination of disability benefits and not a generally applicable emergency order in a pandemic that need only be disseminated to the public through the usual media channels. Indeed, due process is "flexible and calls for such procedural protections as the particular situation demands." *Morissey v. Brewer*, 408 U.S. 471, 481 (1972).

Here, Plaintiffs seem to be seeking some sort of process by which they could challenge a determination that their commercial activity is "non-essential." But they fail to present a viable claim that any additional process was due here to

commercial fitness businesses or organizations.  Many millions of individuals, businesses, and enterprises were all subject to the same general, temporary orders. Plaintiffs have offered nothing in the federal constitution or cases construing it that would have required any more here than general promulgation of the temporary executive orders issued under emergency authority.  *See, e.g., Hartman v Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *6-10 (S.D. Ohio Apr. 21, 2020) (in the context of a TRO, rejecting a plaintiff business owner's procedural due process challenge to Ohio's COVID-19-related "Stay-at-home order" that "direct[ed] non-essential businesses to cease operating their physical locations").

Plaintiffs rely on non-binding authority from Pennsylvania.  *Friends of Danny DeVito v. Wolf*, __ A.3d ___ (Penn., Apr. 13, 2020), 2020 WL 1847100. Plaintiffs suggest that a waiver process for a post-deprivation challenge of essential versus non-essential designations like the one in Pennsylvania should be required in Michigan.  But one state's policy choice is not another state's constitutional mandate.  *DeVito* included no such holding, nor did it hold that procedural due process requires that businesses be afforded the opportunity to dispute the State's determinations regarding what categories of businesses may be open.

To the contrary, *DeVito* emphasized that, under settled law, the purpose of post-deprivation process is to protect individuals and businesses from "mistaken or unjustified" deprivations.  *Carey v. Piphus*, 435 U.S. 247, 259 (1978).  And *DeVito* recognized that Pennsylvania's "waiver" process was sufficient to meet this standard, because it provided a way for individual businesses to demonstrate that

they did not, in fact, fall within one of the categories of businesses deemed "non-life-sustaining" and thus closed under Pennsylvania's order.  *See* 2020 WL 1847100 at *20-21. As *DeVito* made clear, however, this "waiver" process did not provide a mechanism for businesses that did fall within one of the closed categories to challenge that categorical closure decision or to secure an exemption from it—nor did procedural due process require any such thing.  *See id.*

Here, Plaintiffs do not claim that they were mistakenly classified as falling within a certain category of businesses under the Governor's orders. They simply disagree with how that category of businesses is treated under the orders. That disagreement is not enough to ground a viable procedural due process claim.  There is no claim that any of the Plaintiffs were mistakenly or finally deprived of anything.  The restrictions on Plaintiffs are temporary, and the public health concerns justifying them are compelling and paramount.  Plaintiffs can point to nothing to indicate that, given this "particular situation," due process would "demand[]" that they be afforded any further "procedural protections." *Morissey*, 408 U.S. at 481.  Accordingly, Plaintiffs have not shown a substantial likelihood of success on this claim.

### C.    Plaintiffs do not have a viable equal protection claim.

Plaintiffs also fall far short of establishing an equal protection claim. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights

must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* Courts apply a "strong presumption" that a challenged law is valid and plaintiffs have the heavy burden of negating "every conceivable basis" which might support the law. *Id.* at 314-15.

For the reasons already stated, each challenged restriction has a rational basis. During this pandemic, it makes eminent sense to adopt measures that require social distancing, limit person to person contact, and preserve valuable health care resources. This unsurprisingly has meant different things for different businesses. For fitness centers, it means adapting and doing as much as can be done – again, temporarily – remotely via technology or outdoors.

Plaintiffs incorrectly presume that their businesses are indistinguishable from different businesses that are now subject to looser restrictions. Not so.

Even in a lockdown, people have to eat. So it is both rational and expected that grocery stores and food businesses would continue limited in-person operations while Plaintiffs could not. Plaintiffs, however, stress that they too provide a means to engage in life-sustaining activity, and decry the opening of businesses that, in their view, are not comparably beneficial, such as nail salons and massage parlors.

The health benefits of exercise are well recognized. Indeed, that this why the Stay Home Order, from its first iteration, has consistently  permitted outdoor activity like "walking, hiking, running, cycling or any other recreational activity." *See* E.O. 2020-21, § 7(a)(1). For the reasons already discussed, however, indoor

commercial fitness activity is another matter altogether that can be and has been reasonably restricted due to the pandemic.  It is a particular species of exercise that logically and legally need not fall within the same exception for types of exercise that do not pose the same combination of heightened risks of infection and spread.[22] Likewise, that combination of heightened risks sets Plaintiffs apart from other businesses that have been permitted to resume providing in-person, indoor services more fully at this point.  Meanwhile, businesses that tend to present a risk profile more comparable to Plaintiffs', such as indoor places of recreation, remain subject to the same operational restrictions as Plaintiffs.

Simply put, there are multiple, readily apparent rational bases that inform and support the restrictions that have been put in place and when and how they have been lifted.  Plaintiffs' mere disagreement with this reasoning and the lines that have been drawn from it does not negate the many "reasonably conceivable state[s] of facts" that support it or overcome the "strong presumption" that it is constitutionally valid.  *FCC*, 508 U.S. at 313–14.  Accordingly, Plaintiffs' equal protection challenge is not likely to succeed.

---

[22] To the extent that Plaintiffs raise the health concerns of their customers, Plaintiffs have failed to cite any recognized theory of third party standing that would apply here.  Even with such standing, alternative means of exercise that are permitted would mean no injury in fact and no redressability here.  Furthermore, Plaintiffs have failed to acknowledge or address the various ways in which they can still serve the health needs of their customers, such as through remote, outdoor, or in-home services.

**D.    Plaintiffs do not have a viable dormant commerce clause claim.**

By empowering Congress to regulate interstate commerce, the Commerce Clause is interpreted to, correspondingly, prohibit states from interfering with the same. U.S. Const., Art. I, s. 8, cl. 3. This negative implication, commonly known as the "dormant commerce clause," "prohibit[s] outright economic protectionism or regulatory measures designed to benefit in-state economic actors by burdening out-of-state actors." *E. Ky. Res. v. Fiscal Court*, 127 F.3d 532, 540 (6th Cir. 1997). A two-tiered analysis applies to such claims. "The first prong targets the core concern of the dormant commerce clause, protectionism – that is 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009) (quoting *Or. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). The second applies where, as here, the order invokes no inkling of in-state protectionism but, instead, applies to all businesses operating with this state. In this situation, the order is presumed valid unless its burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Plaintiffs bear the burden of demonstrating this second prong weighs in their favor. It is a burden they cannot meet here.

Any burden of the executive orders on interstate commerce or out-of-state actors is minuscule compared to the benefit to the state and local communities as a whole. The challenges presented by the spread of COVID-19 have required swift and nimble action throughout Michigan to stop the spread of a highly contagious and deadly disease. This includes the complained-of restrictions on indoor

commercial fitness activity raised in Plaintiffs' amended complaint. Many businesses and individuals throughout the State have faced these necessary and temporary restrictions.

But nothing in the executive orders regulates interstate commerce as interstate commerce. Impacts on such commerce may be inevitable, but that is not the focus of any of the challenged restrictions. This factor alone distinguishes this case from recognized dormant commerce clause challenges. Additionally, none of the challenged orders seek to regulate any conduct outside of the State of Michigan. While Plaintiffs were impacted by the restrictions and presumably engaged in some measure of interstate commerce, those factors alone fall far short of a viable commerce clause challenge.

Further, in *Pike*, the Supreme Court specifically recognized that its holding was influenced by the fact that it was not dealing with "state legislation in the field of safety where the propriety of local regulation has long been recognized." *Pike*, 397 U.S. at 143. This is not the case here. Dealing with public health in general and a pandemic in particular fall squarely within deeply rooted local and state police powers, and Plaintiffs offer nothing to show that the limited and temporary restrictions they challenge are somehow "clearly excessive" in comparison to the critical protections those restrictions provided to the residents, communities and health care system of this State during this pandemic. Therefore, Plaintiffs' claim for relief under dormant commerce clause doctrine is not likely to succeed.

30

### III.   Plaintiffs make an inadequate showing of irreparable harm.

Not only have Plaintiffs failed to show a likelihood of success on the merits of their claims, they have also failed to show, as they must, that they will suffer irreparable injury without the preliminary injunction they request.  *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

As demonstrated in the preceding sections, Plaintiffs' constitutional rights are not being violated, and their bald assertions about insolvency, loss of customers, goodwill, and future business do not amount to irreparable harm.

Plaintiffs' failure to offer any evidentiary support for their vague assertions of injury cannot be ignored in light of the heavy burden upon them.  Nor is it appropriate to presume such injury from the existence of the Executive Orders in recent months.  The fact that the need for social distancing has impacted some of the services Plaintiffs offer does not automatically translate into the doomsday outcomes they postulate.  Society is adapting to mitigate the impact of COVID-19. The fitness industry is no exception.

Plaintiffs also say nothing about the adjustments and accommodations they have made to provide supportive services, such as online, outdoor, or in-home training, to their customers while the temporary limitations on their normal operations are in place.  Technology in the form of video, audio, and web-based services can mitigate the closure of physical facilities.  The same is true for outdoor

classes and trainer input for individually executed remote participation. And
Plaintiffs remain free to sell any products they may carry via delivery or curbside
pickup, or at any outdoor classes they may offer.

Loss of goodwill, further, is speculative and unwarranted. Customer blame,
if any, would be directed at the pandemic or at government response to it, and not
to any specific fitness center subject to the same industry-wide restrictions
impacting its friends and competitors alike.

In the absence of evidence to the contrary, this factor favors Defendants.

## IV.   A preliminary injunction would not serve the public interest.

The third and fourth factors are similar—whether an injunction will cause
substantial harm to third parties, and whether it would serve the public interest.
In regard to the fourth factor, the public interest "will not be as important as the
other factors considered in the award of preliminary injunctive relief in actions
involving only private interests, [but] it will be prominently considered in actions
implicating government policy or regulation, or other matters of public concern." 13
Moore's Federal Practice § 65.22 (Matthew Bender 3d. ed).

Here, issuing an injunction that precludes enforcement of any part of the
Governor's executive orders would harm third parties and would not benefit the
public. The orders were put in place after careful consideration of the unique
nature of the threat facing Michigan and the advice of numerous individuals and
entities with unique expertise. A piecemeal lifting of restrictions by this Court,
without regard to the State's carefully considered, deliberate, ongoing plan to
combat the crisis and safely transition back to normalcy, increases the risk and

potential harm to everyone.  For the reasons already briefed, a particular party's race to the courthouse should not control who is and is not excepted, particularly in a time of great public need when all in Michigan must grab hold of an oar and row in the same direction.  As a result, the third and fourth factors favor Defendants as well.

## CONCLUSION AND RELIEF REQUESTED

Defendants Whitmer and Gordon respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction and grant any other appropriate relief to Defendants.

Respectfully submitted,

/s/ *John G. Fedynsky*
John G. Fedynsky (P65232)
Assistant Attorney General
Attorney for Defendants
Whitmer and Gordon
Michigan Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
517.335.7573
fednyskyj@michigan.gov
P65232

Dated:  June 12, 2020

## CERTIFICATE OF SERVICE

I certify that on June 12, 2020, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record, and I certify that my secretary has mailed by U.S. Postal Service the papers to any non-ECF participant.

*/s/ John G. Fedynsky*
John G. Fedynsky (P65232)
Assistant Attorney General