UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAGUE OF INDEPENDENT FITNESS FACILITIES )
AND TRAINERS, INC., et al.,  )
                Plaintiffs,  )
                           )  No. 1:20-cv-458
-v-  )
                           )  Honorable Paul L. Maloney
GRETCHEN WHITMER and  )
ROBERT GORDON,  )
                Defendants.  )
                           )

## OPINION

This matter is before the Court on Plaintiffs' motion for a preliminary injunction (ECF No. 32). Plaintiffs seek to enjoin Defendants from enforcing Michigan Executive Order ("EO") 2020-110 and EO 2020-115.[1] In effect, Plaintiffs wish to reopen their indoor fitness facilities. The Court offered to take evidentiary proofs (none were offered) and heard oral argument on the motion on June 17, 2020. For the reasons to be stated, the Court will grant the motion.

### I.

This case exists because of the coronavirus pandemic, which needs no introduction. To contain the virus, Governor Gretchen Whitmer has issued over 120 executive orders.

---

[1] Plaintiffs also seek to enjoin enforcement of an April 2, 2020 statement made by Michigan Department of Health and Human Services ("HHS") Director Robert Gordon. Gordon issued an emergency order authorizing local health departments to carry out and enforce the terms of the Executive Orders "and their accompanying frequently asked questions." Plaintiffs challenge the ability of local health departments to enforce the FAQs, given that they are subject to change informally. On May 18, 2020, Gordon filed an updated order rescinding the April 2 order, but still authorizing local health departments to carry out and enforce the terms of the Executive Orders. Given that the objectionable part of the statement has been rescinded and the HHS's position now requires only enforcement of the Executive Orders themselves, the Court need not evaluate the HHS order separately.

On March 16, 2020, Governor Whitmer issued EO 2020-09, titled "Temporary restrictions on the use of places of public accommodation." (*See* ECF No. 33-4.) Paragraph 1(f) of that Order closed all "Gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, and spas" (*Id.*). As the situation changed, so too did the Governor's orders: several iterations of the "Temporary restriction" order have been issued, each time changing slightly to meet the moment but staying firm on the closure of indoor exercise facilities (*See, e.g.*, EO 2020-20, ECF No. 33-5; EO 2020-43, ECF No. 33-6; EO 2020-69, ECF No. 33-7).

As of the time of writing, one of the operative Orders is EO 2020-110, titled "Temporary restrictions on certain events, gatherings, and businesses" (*See* ECF No. 33-15). Paragraph 12(b) of that order requires "Indoor gymnasiums, fitness centers, recreation centers, sports facilities, exercise facilities, exercise studios, and the like" to remain closed to ingress, egress, use, and occupancy by members of the public in most of the state (*Id.* at ¶ 12(b)). Paragraph 19 of that Order makes clear that a willful violation of the Order is a misdemeanor (*Id.* at ¶ 19).

Executive Order 2020-115, titled the same, is also presently in effect (*See* ECF No. 33-16). This Order repeals EO 2020-110 for the entire upper peninsula and parts of the lower peninsula (*Id.* at ¶ 3). That Order also allows arcades, bowling alleys, climbing facilities, night clubs, sports arenas, and other similar venues to open throughout the state, subject to capacity restrictions. (*Id.* at ¶ 7(b)).

The Plaintiffs in this case are 22 individual companies that own and operate fitness businesses in Michigan, as well as the League of Independent Fitness Facilities and Trainers,

2

Inc., ("LIFFT"), which is a trade organization that represents over 150 fitness facilities throughout the state. On May 22, 2020, they filed this lawsuit, alleging that Defendants are violating several of their constitutional rights by forcing them to keep their businesses closed. On June 8, 2020, Plaintiffs moved for a preliminary injunction, seeking to enjoin Defendants from enforcing EO 2020-110 and EO 2020-115 to the extent that those orders require Plaintiffs to keep their indoor fitness facilities closed.

## II.

A trial court may issue a preliminary injunction under Federal Rule of Civil Procedure 65. A district court has discretion to grant or deny preliminary injunctions. *Planet Aid v. City of St. Johns, Michigan*, 782 F.3d 318, 323 (6th Cir. 2015). A court must consider each of four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quoting *Northeast Ohio Coalition for Homeless & Service Employees Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).

The four factors are not prerequisites that must be established at the outset but are interconnected considerations that must be balanced together. *Northeast Ohio Coalition*, 467 F.3d at 1009; *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th

Cir. 2002) (internal citation omitted); see *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)).

The purpose of a preliminary injunction is to preserve the status quo. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 873 n. 13 (6th Cir. 2007) (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)). The Sixth Circuit has noted that "[a]lthough the four factors must be balanced, the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures*, 39 F. App'x at 967 (citing *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

### III.

### A.

At the outset, Defendants argue that Plaintiffs do not have standing to bring this case. In Defendants' eyes, Plaintiffs have not suffered an "injury-in-fact" as required by Article III because they bring pre-enforcement claims.

To satisfy the Constitution's standing requirements, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). On the first prong, an actual injury is not required if Plaintiffs demonstrate that they have been forced to choose between their constitutional interest and prosecution: "When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

(2014). Pre-enforcement review is appropriate if circumstances render the threatened enforcement "sufficiently imminent." *Id.* at 159. Under this standard, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " *Id.* (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).

That is the case here: Plaintiffs would like to reopen their gyms, and they argue that the state of Michigan is violating their constitutional rights as long as it prevents them from doing so. Each relevant executive order notes that a willful violation of the order is a misdemeanor (*See, e.g.*, EO 2020-115 at ¶ 15). If Plaintiffs violate the orders and open their gyms, they are faced with a credible threat of prosecution. This is underscored by Attorney General Dana Nessel's statements that if gym owners "go ahead and violate the law knowing and understanding what the law is – then, unfortunately they'll have to pay the consequences for it." *See Michigan attorney general issues warning to businesses violating Gov. Whitmer's order, Click on Detroit* (ECF No. 37-2). The State Attorney General's office has requested local police departments to investigate gyms that are violating the order (*Id.*). Defendants' argument that there is no credible threat of prosecution is disingenuous. Therefore, the individual Plaintiffs have standing to bring this case.

Defendants also allege that LIFFT does not have standing to sue. As a representative association, LIFFT must demonstrate associational standing, which is met when "(1) the organization's members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the

claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Tims Ford v. Tennessee Valley Authority*, 585 F.3d 955, 967 (6th Cir. 2009) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (quotation marks omitted)). This requires an association to "allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had them members themselves brought suit." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (quotation marks omitted)).

Defendants argue that LIFFT does not have standing because its members do not have standing. But for the same reasons that the individual Plaintiffs have standing, LIFFT's members have standing. Therefore, LIFFT has standing as a representative association.

**B.**

Turning, then, to Plaintiffs' likelihood of success on the merits of their claims: Plaintiffs' motion focuses on three alleged constitutional violations. They argue that Defendants are violating their rights to procedural due process, equal protection, and the guarantees of the dormant Commerce Clause. The three arguments present slightly different considerations, but at bottom, all of Plaintiffs' constitutional positions argue that the continued restrictions on indoor gyms do not survive even rational basis review.

"Procedural due process imposes constrains on governmental decisions that deprive individuals of 'liberty' or 'property' interests within the meaning of the Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). These liberty and property

interests may not be obstructed by a legislative action under the guise of protecting the public interest if that action is "arbitrary or without some *reasonable relation* to some purpose with the competency of the state to effect." *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923) (emphasis added). The alleged due process violation in this case is the State's ongoing failure to provide a post-deprivation hearing; the due process claim did not arise at the outset of the deprivation. See *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). But that is only tangential to the Court's decision today: In any event, the State cannot act without some "reasonable relation" to a government interest. *Meyer*, 262 U.S. 399-400.

Similarly, the Equal Protection Clause of the Fourteenth Amendment provides that no state can "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1, cl. 4. Under this standard, a state action that regulates economic activity in a discriminatory manner violates the Equal Protection clause unless the state can show a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366-67 (2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). This is not a high bar; the government's decision must be upheld unless it is "arbitrary or irrational." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). This requires the Court to uphold any order that the State can justify with any set of facts that creates a "conceivable rational basis." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 309 (1993).

7

Finally, the "dormant" Commerce Clause[2] restricts states from regulating the flow of interstate commerce. *Huish Detergents, Inc., v. Warren Co., Kentucky*, 214 F.3d 707, 712 (6th Cir. 2000). A state's regulation of interstate commerce is prohibited under the dormant Commerce Clause if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits" even in the absence of discrimination against out-of-state business interests in favor of in-state business interest. *Id.* at 713 (quoting *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 390 (1994)). Thus, a burden on interstate commerce that had no rational justification would be invalid. *Cavel Int'l, Inc., v. Madigan*, 500 F.3d 551, 556 (7th Cir. 2007).

On each argument, Plaintiffs are required to show that Defendants' actions do not have a rational relation to the stated government interest of protecting the public health.[3] Plaintiffs must show that there is no conceivable set of facts from which a rational relation can be drawn. This is where the Court would begin in normal times, but it is abundantly clear that "normal times" ended in early March when the coronavirus pandemic took hold in Michigan.

When state actors are faced with "great dangers" like a pandemic, they may use their police power with great latitude to protect the health and safety of the general public. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905). The state may temporarily infringe on the liberties guaranteed by the constitution to individuals in favor of

---

[2] The Commerce Clause gives Congress the power to regulate commerce among the states. U.S. Const., Art. I, § 8, cl. 8. The Supreme Court has interpreted this to mean that states' ability to restrict or discriminate against interstate commerce is limited; hence the term "dormant" Commerce Clause. *See, e.g., Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337-8 (2008).
[3] Plaintiffs do not challenge the legitimacy or the gravity of the State's interest in this case.

8

the common good: "Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others." *Id.* at 26.

In *Jacobson*, faced with a growing smallpox epidemic, the city of Cambridge, Massachusetts enacted a mandatory vaccination law; violators were subject to a criminal fine. *Id.* at 12. The defendant argued that the law violated his Fourth Amendment right "to care for his own body and health in such way as to him seems best." *Id.* at 26. The Supreme Court upheld the law as a proper exercise of the State's police power, given the exigencies and the dangerousness of the public health crisis: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. The Court recognized that generally, individual constitutional rights were inalienable, but also that

> every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id.* at 29. Therefore, the Court declined to "usurp the functions of another branch of government" by second-guessing the executive's exercise of police power in the face of the pandemic. *Id.* at 28.

However, the *Jacobson* Court did not give states carte blanche to infringe on the constitutional rights of their citizens under the guise of public safety. The Court noted that the state's police power "might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what

9

was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.* at 28. Thus, restrictions may be subject to judicial review if the challenged action "has no real or substantial relation to those objects [of securing public health and safety], or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31.

A growing number of courts, both federal and state, have applied *Jacobson* to COVID-19 related regulations in the last few months, including the Sixth Circuit and the Supreme Court. The Sixth Circuit has confirmed that *Jacobson* is the proper starting point for evaluating restrictions promulgated in response to the pandemic that touch upon constitutional rights. *See, e.g., Marysville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 922 (6th Cir. 2020). In those cases, the Circuit Court held that despite the extremely deferential standard of *Jacobson*, the plaintiffs were likely to succeed on the merits of their claims challenging a complete abortion ban in Tennessee and a total ban on group religious services in Kentucky. These cases are useful guidance, but they are not quite parallel to the case presented here. The cases considered by the Sixth Circuit thus far have evaluated restrictions on the exercise of fundamental constitutional rights, not a restriction on the exercise of commercial activity.

The Supreme Court has also provided some guidance on the issue. *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (Mem) (U.S. 2020) (Roberts, C.J., concurring). In *South Bay*, a Supreme Court majority declined to grant injunctive relief to a party challenging a California executive order that created limitations on public gatherings, including religious worship gatherings, based on considerations of health and safety. *Id.* at

*1. In his concurring opinion, Chief Justice Roberts relied on *Jacobson* to explain that the constitution "principally entrusts" question of health and safety to the "politically accountable officials of the States." *Id.* (citing *Jacobson*, 197 U.S. at 38). When state officials act "in areas fraught with medical and scientific uncertainties," Chief Justice Roberts explained that "their latitude must be especially broad." *Id.* (citing *Marshall v. United States*, 414 U.S. 417, 427 (1974)). When operating within those limits, the state "should not be subject to second-guessing" by the judiciary, which lacks the "background, competence, and expertise to assess public health." *Id.* (citing *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)). Therefore, since California's order treated all large gatherings similarly, the Court declined to intervene to grant injunctive relief. *Id.*

Taking this framework and applying it to the case at hand: the Court must uphold Governor Whitmer's orders unless they have "no real or substantial relation" to the public health crisis, or the challenged order is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Plaintiffs only argue the former: the continued closure of gyms is arbitrary and unreasonable because gyms are basically the only category of businesses that remain closed in Michigan, and because the State has not put forward any scientific data that supports keeping gyms closed while opening other closely similar activities and businesses, such as swimming pools, restaurants and bars, and "personal touch" services like salons.

As evidenced by *South Bay*, this standard of review is highly deferential to the executive branch. It is not this Court's place to second-guess the executive's pandemic plan, to apply its own policy judgments to that plan, or to use hindsight to craft a "better" plan.

11

Rather, this Court must uphold the Governor's Executive Orders as long as they are supported by some relation to the public health. Unfortunately, on the record before it, the Court has not been presented with any evidence that shows a rational relation between the continued closure of indoor gyms and the preservation of public health.

While the standard is extremely deferential here—if the Court can conceive of any set of facts that would support the Orders, it must uphold them and deny the injunction—the Orders must still connect the challenged prohibition with *some* fact or facts. At oral argument, the Court pressed Defendants on what data, evidence, or rationale supported the continued closure of indoor gyms. Defendants cited to the preambles of the Executive Orders and vaguely stated that indoor gyms are a "petri dish" of infection, but Defendants could not point to any facts in the record to support that statement. Defendants emphasized the low bar: all that needed to be presented was a reasonably conceivable set of facts that connected the continued closure to protecting the public health. But when asked, even counsel was unable to state a rational basis to support the position that indoor gyms must still be closed. Defendants merely reiterated that a threat of transmission exists at indoor gyms, and the threat of transmission must be minimized.

The Court accepts that statement as true, but it only carries Defendants so far. In March, when the pandemic was accelerating sharply and the science was unclear, the potential for virus transmission indoors was used to close much of the state of Michigan. The transmission and infection data, broad as it was at the time, was used to close broad swaths of the economy. But the State has begun to chip away at that broad closure and make more specific policy decisions, which at least a scintilla of evidentiary support. The Court must

12

look at what has been chipped away from the initial closure. Many indoor venues and indoor activities are now permitted: retail is now open with some restrictions, restaurants and bars may serve patrons at limited capacity, nail and hair salons and tattoo parlors can provide grooming services, children's camps can resume service, and even indoor gaming venues like bowling alleys, climbing facilities, and nightclubs can open subject to capacity limits. But indoor gyms and other fitness facilities remain closed.

With these changes, there is no longer a generally applicable closure of non-essential businesses. *See Marysville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) ("As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law."). There must be some rational relation that distinguishes gyms from these now-opened businesses. Most of Governor Whitmer's executive orders refer to five factors that the State considers useful in evaluating changes to the pandemic response (*See, e.g.*, EO 2020-115 at ¶ 14). The State is apparently looking at detailed data including the virus transmission rate, the availability and need for personal protective equipment, the capacity for testing, and the economy (*Id.*). Again, when asked at oral argument what that rational relation for continued closure of gyms is, Defendants did not refer to those five factors or any other factor. Counsel could not articulate a reason beyond the bare assertion that gyms are dangerous. This Court fully recognizes that the bar is extremely low, but it is not that low. Defendants cannot rely on the categorization of gyms as "dangerous," without a single supporting fact, to uphold their continued closure. This is particularly true when almost all other indoor businesses have been opened, and indoor gatherings of up to 50 people are permitted—so long as they are not inside a gym. Gyms are

13

being treated dissimilarly without any justification for the distinction, given the record before the Court.

The Court must also address Defendants' "slippery slope" argument. Defendants argue that if this injunction is granted, a veritable flood of litigation would ensue, with each sector of the economy seeking to reopen based on this opinion. The Court notes that both it and the Michigan Courts have already been deluged with litigation seeking the same.[4] The argument presented to the Court on this motion, however, points out a different slope the Defendants may create: if Defendants can open or close any sector of the economy, at will, with nothing more than a vague reference that it is "dangerous," the potential for abuse is palpable. To be sure, the coronavirus pandemic has devastated parts of the country and the state and containing the transmission of the virus is crucial. Activities that are dangerous *should* be avoided, for the public health. But after more than 90 days of closure, the scientific knowledge of the virus has grown and Michigan has made great gains in containing the pandemic. At this point, the bare assertion that gyms are dangerous is not enough to demonstrate a "real or substantial" connection to public health, nor is it a set of facts establishing rational basis to justify their continued closure.

The Court must emphasize that it does not wish to disturb the choices Governor Whitmer has made. While the last few months have been painful, physically for some and

---

[4] *See, e.g., Midwest Institute of Health, PLLC, et al. v. Whitmer, et al.*, Case No. 1:20-cv-414 (W.D. Mich.); *Mitchell v. Whitmer et al.*, Case No. 1:20-cv-384 (W.D. Mich.); *Signature Sothbeys Int'l Realty, Inc., et al. v. Whitmer, et al.*, Case No. 1:20-cv-360 (W.D. Mich.); *Beemer, et al. v. Whitmer, et al.*, Case No. 1:20-cv-323 (W.D. Mich.); *House of Representatives v. Whitmer*, Case No. 353655 (Mich. Ct. App.); *Michigan United for Liberty v. Whitmer*, Case No. 353643 (Mich. Ct. App.); *Dep't of Health & Human Services v. Manke*, Case No. 353607 (Mich. Ct. App.); *Martinko v. Whitmer*, Case No. 353604 (Mich. Ct. App); *Slis v. Michigan*, Case No. 351211 (Mich. Ct. App.); *Associated Builders & Contractors of Michigan v. Whitmer*, Case No. 20-000092-MZ (Mich. Ct. Cl.).

economically for all, the Court recognizes that Michigan has made great strides towards containing the pandemic, in great part because of the choices Governor Whitmer has made. In the Governor's own words, those choices have been based on data and science, and the Court commends and respects that. But when asked what data, science, or even rationale supports the continued closure of indoor gyms, Defendants presented *nothing* beyond "trust us, they're still dangerous." From that vague statement and nothing more, the Court cannot create a set of facts that rationally connects the restriction with the legitimate government interest of protecting the public health.

In sum: on the record before it, the Court cannot conclude that ¶ 12(b) of EO 2020-110 survives the deferential review it is due under *Jacobsen*. Defendants offer nothing in support of the restriction, so it appears to have no "real or substantial" basis to protecting the public health. Nor can the Court identify any set of facts on which the gym restriction has a rational relation to public health, in light of the opening of similar venues and activities like swimming pools, restaurants and bars, and "personal touch" services like salons. Therefore, Plaintiffs have demonstrated a likelihood of success on the merits of at least some of their claims.

## C.

Next, the Court must evaluate whether Plaintiffs are at risk of suffering irreparable harm. Generally, irreparable harm is harm that cannot be remedied with money damages. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). However, irreparable harm may exist if a plaintiff's business is threatened with insolvency or its financial viability is threatened. *See Performance Unlimited, Inc. v. Questar*

15

*Publishers Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1985). The "impending loss or financial ruin" of a business constitutes irreparable injury. *Id.*

Many Plaintiffs are threatened with insolvency because they are small businesses that have been shut down for over 13 weeks. At least one Plaintiff has lost 100% of its revenue, and many others are facing similar drastic cuts to revenue while still paying rent and various other bills (*See* ECF No. 37-1 at PageID.541). Many Plaintiffs fear the complete shuttering of their businesses. The Court is satisfied that Plaintiffs have shown that they are at risk of irreparable harm if this injunction does not issue.

### D.

The third and fourth factors to be considered are the risk of harm to others and whether the public interest would be served by entry of the order. These blend together: the increased risk of harm to the public via transmission of the virus is effectively the inverse of the public interest in being safe from the pandemic. However, the analysis is largely answered by the first factor. Given the conclusion that the Court has not been presented with a relation between the continued closure of indoor gyms and the public health, the Court finds that the public interest will not be harmed by entry of the order.

### IV.

On this record, each factor in the preliminary injunction analysis favors Plaintiffs. Faced with imminent harm, Plaintiffs presented Defendants with a simple question: why must we remain closed? Defendants answered with a blanket "trust us" statement that is insufficient to uphold a no-longer-blanket rule. The Court will grant Plaintiffs' motion and enjoin enforcement of ¶ 12(b) of Executive Order 2020-110.

Because of the way Governor Whitmer has set up the system of Executive Orders, when gyms reopen, they will be subject to the requirements set out in the operative workplace standards Order.[5] Thus, the Court need not edit or amend any of Governor Whitmer's practices, and the operation of gyms will begin in a modified manner that the Governor's office has deemed appropriate through the issuance of EO 2020-114. Further, the Court does not wish to "flip the switch" and open gyms immediately, as that would be inconsistent with Governor Whitmer's practice.[6] Finally, the Court does not see a need to enjoin enforcement of any portion of Executive Order 2020-115, as nothing in that Order prevents or inhibits the opening of indoor gyms.

Accordingly,

**IT IS HEREBY ORDERED** that as of 12:01 a.m. on Thursday, June 25, 2020, Defendants are enjoined from enforcing ¶ 12(b) of Executive Order 2020-110.

**IT IS SO ORDERED.**

Date: June 19, 2020                                                       /s/ Paul L. Maloney
                                                                                            Paul L. Maloney
                                                                                            United States District Judge

---

[5] At present, those standards are outlined in ¶ 13 of EO 2020-114.
[6] For example, when Governor Whitmer announced that gyms would be allowed to open in part of the state, she did so on June 5 with an effective date of June 10. *See* EO 2020-110. The Court wishes to extend the same "grace period" to gyms in the remainder of the state.