**DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEAGUE OF INDPENDENT FITNESS
FACITLITIES AND TRAINERS, INC.,
BASELINE FITNESS LLC,
BUILDING YOUR TEMPLE LLC,
BYT FITNESS 247 LLC,
CLAWSON FITNESS, LLC,
CLINTON FITNESS, INC.,
D-LUX KARATE UNIVERSITY LLC,
FENTON ATHLETIC CLUB, INC.,
FENTON KARATE, LLC,
FUSION FITNESS 24/7 LLC,
H3 FITNESS LLC,
I FITNESS PERSONAL TRAINING, INC.,
JKP FITNESS, LLC,
JPF ENTERPRISES, LLC,
M FITNESS CLUB, LLC,
MH & AB LLC,
MOTOR CITY CF - ST. CLAIR SHORES,
LLC,
NASCOT ENTERPRISES, LLC,
PRISON CITY PHYSIQUE LLC,
RMP FITNESS INC.,
STRENGTH BEYOND LLC,
24/7 BOOTCAMP AND BOXING INC., and
4 SEASONS GYM, LLC,

     Plaintiffs,

v.

GRETCHEN E. WHITMER and
ROBERT GORDON,

     Defendants.

Civil No. 1:20-cv-00458

Hon. Paul L. Maloney

ERSKINE LAW, PC
Scott M. Erskine (P54734)
Carly Van Thomme (P59706)
Attorneys for Plaintiffs
612 W. University
Rochester, MI. 48307
(248) 601-4499
serskine@erskinelaw.com
cvanthomme@erskinelaw.com

Joseph T. Froehlich (P71887)
Christopher M. Allen (P75329)
Joshua O. Booth (P53847)
John G. Fedynsky (P65232)
Andrew J. Jurgensen (P81123)
Assistant Attorney General
Michigan Department of Attorney General
Attorneys for Defendants
525 West Ottawa Street
P.O. Box 30754
Lansing, MI  48909
(517) 335-7573
froehlichj1@michigan.gov
allenc28@michigan.gov
Boothj2@michigan.gov
fedynskyj@michigan.gov
jurgensenA2@michigan.gov

---

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

NOW COME Plaintiffs, League of Independent Fitness Facilities and Trainers, Inc., et. al., by and through their attorneys, Erskine Law, PC, for Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss. For the reasons stated in Plaintiffs' Response Brief in Opposition to Defendants' Motion to Dismiss, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion to Dismiss in its entirety.

Dated: July 16, 2020                     Respectfully submitted,

                                         /s/ Scott M. Erskine_____
                                         SCOTT M. ERSKINE (P54714)
                                         CARLY VAN THOMME (P59706)
                                         ERSKINE LAW, PC
                                         Attorneys for Plaintiffs
                                         612 West University Drive
                                         Rochester, Michigan 48307
                                         (248) 601-4497
                                         serskine@erskinelaw.com

**DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

LEAGUE OF INDPENDENT FITNESS
FACITLITIES AND TRAINERS, INC.,
BASELINE FITNESS LLC,
BUILDING YOUR TEMPLE LLC,
BYT FITNESS 247 LLC,
CLAWSON FITNESS, LLC,
CLINTON FITNESS, INC.,
D-LUX KARATE UNIVERSITY LLC,
FENTON ATHLETIC CLUB, INC.,
FENTON KARATE, LLC,
FUSION FITNESS 24/7 LLC,
H3 FITNESS LLC,
I FITNESS PERSONAL TRAINING, INC.,
JKP FITNESS, LLC,
JPF ENTERPRISES, LLC,
M FITNESS CLUB, LLC,
MH & AB LLC,
MOTOR CITY CF - ST. CLAIR SHORES,
LLC,
NASCOT ENTERPRISES, LLC,
PRISON CITY PHYSIQUE LLC,
RMP FITNESS INC.,
STRENGTH BEYOND LLC,
24/7 BOOTCAMP AND BOXING INC., and
4 SEASONS GYM, LLC,

      Plaintiffs,

v.

GRETCHEN E. WHITMER and
ROBERT GORDON,

      Defendants.

Civil No. 1:20-cv-00458

Hon. Paul L. Maloney

---

ERSKINE LAW, PC
Scott M. Erskine (P54734)
Carly Van Thomme (P59706)
Attorneys for Plaintiffs
612 W. University
Rochester, MI. 48307
(248) 601-4499
serskine@erskinelaw.com
cvanthomme@erskinelaw.com

Joseph T. Froehlich (P71887)
Christopher M. Allen (P75329)
Joshua O. Booth (P53847)
John G. Fedynsky (P65232)
Andrew J. Jurgensen (P81123)
Assistant Attorney General
Michigan Department of Attorney General
Attorneys for Defendants
525 West Ottawa Street
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
froehlichj1@michigan.gov
allenc28@michigan.gov
Boothj2@michigan.gov
fedynskyj@michigan.gov
jurgensenA2@michigan.gov

---

## PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................................1

I.    The Plaintiffs Are Fitness Centers, Each of Whom Is Prevented by the Defendants' Executive Orders from Providing Preventative Physical and Mental Health..................................................................................................1

II.    Governor Whitmer Issues Executive Orders Declaring a State of Emergency .............3

III.    Governor Whitmer Issues Several Executive Orders, ALL Prohibiting Business Operations of Gyms Where Even One Gym Member is in the Entire Studio ..........................................................................................................4

IV.    Governor Whitmer Issues Several Orders Prohibiting Most In-Person Business Operations, Including the Operations of Gyms With Only One Member ........................................................................................................4

V.    The Governor Lifts (Almost) All Restrictions...............................................5

VI.    The Governor Lifts Even More Restrictions on June 5, 2020 ......................6

VII.   Governor Whitmer's Executive Orders Cause Enormous Confusion ..........................7

    A.  Governor's Orders Cause Confusion....................................................................7

    B.  The Governor's Executive orders are Arbitrary .................................................10

STANDARD OF REVIEW ..................................................................................................12

ARGUMENT ........................................................................................................................15

I.   Plaintiffs Stated Claims are Justiciable..........................................................15

    A.  Plaintiffs have standing under the law of this case. ...............................15

    B.  Plaintiffs do not contest the assertion of sovereign immunity..............16

II.   Plaintiffs' Stated Claims are Viable...............................................................16

    A.  Defendants' reliance on *Jacobson* is misguided as the EOs are both arbitrary and unreasonable. .....................................................................16

    B.  Plaintiffs' Equal Protection Claim is viable. ..........................................19

    C.  Plaintiffs' Procedural Due Process Claim is viable................................22

        1. Plaintiffs have legitimate, constitutionally protected, liberty and property interests.......................................................................23

        2. Defendants have deprived Plaintiffs' of their constitutionally protected liberty and property interests.......................................24

        3. Defendants have provided no process when depriving Plaintiffs of their constitutionally protected liberty and property interests. .................25

    D.  Plaintiffs' Substantive Due Process Claim is viable. .............................29

    E.  Plaintiffs' Dormant Commerce Clause Claim is viable. .........................31

    F.  Plaintiffs' Void for Vagueness Claim is viable.......................................33

    G.  Plaintiffs do not oppose dismissal of their Privileges and/or Immunities Claims. .......................................................................................................35

CONCLUSION.....................................................................................................................35

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................14

*Batsakis v. Fed. Deposit Ins. Corp.*, 670 F. Supp.749 (W.D. Mich. 1987) .................14

*Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ...................................20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................13

*Board of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) .................................23, 25

*Brady-Morris v. Schilling (In re Kenneth Allen Knight Tr.)*, 303 F.3d 671 (6th Cir. 2002) .........16

*C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383 (1994)............................32

*Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007) ........................................33

*Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011).......................20

*Cty. of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ...............................20, 21

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998).......................................................29

*Collins v. Harker Heights*, 503 U.S. 115 (1992) .........................................................29

*Comptroller of the Treasury v. Wynne*, 575 US 542 (2015)..........................................32

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ..........................................31

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) .....................................32

*Freeman v. Francis*, 196 F.3d 641 (6th Cir. 1999).....................................................13

*Friends of Devito v. Wolf*, ___A3d___; 2020 Pa. LEXIS 1987 (Apr. 13, 2020).................... 26-28

*Fuentes v. Shevin*, 407 U.S. 67 (1972)........................................................................28

*Gilbert v. Homar*, 520 U.S. 924, 930; 117 S. Ct. 1807; 138 L. Ed. 2d 120, 127 (1997) .............26

*Goss v. Lopez*, 419 U.S. 565 (1975) ..........................................................................28

*Granholm v. Heald*, 544 U.S. 460 (2005) .................................................................................32

*Greenberg v. Life Ins. Co. of Va.,* 177 F.3d 507 (6th Cir. 1999) ............................................14

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .................................................................................28

*Huish Detergents, Inc. v Warren Co.*, 214 F3d 707 (6th Cir. 2000).................................31, 32

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)...............................................................4, 16, 17

*Kolender* v. *Lawson*, 461 U.S. 352 (1983) .................................................................................33

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................................................................22, 25, 27

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ..............................................................................23, 24

*Michigan Dep't of State Compliance & Rules Div.* v. *Michigan Educ. Ass'n*, 251 Mich.
App. 110 (2002) ......................................................................................................................33

*Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266 (6th Cir. 1990) ...........................15

*Morrissey* v. *Brewer,* 408 U.S. 471 (1972)..................................................................................25

*Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244 (6th Cir. 1996) ...........................13

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990)................................. 13-16

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829
(6th Cir. 2012)........................................................................................................................13

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir.2000)...................................................................13, 14

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .......................................................................32

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) ........................................................................17

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir. 1996).........................15

*S. Macomb Disposal Auth. v. Washington*, 790 F.2d 500 (6th Cir. 1986)..............................22, 29

*Sanderson v. Village of Greenhills*, 726 F.2d 284 (6th Cir. 1984) .............................................24

*Stalley v. Methodist Healthcare*, 517 F.3d 911 (6th Cir. 2008)...................................................13

*Taylor v. City of Saginaw*, 922 F.3d 328 (6th Cir. 2019) ...........................................................14

*United States* v. *James Daniel Good Real Property,* 510 U.S. 43 (1993) .....................................26

*United States v. Salerno*, 481 U.S. 739 (1987) .....................................................................29

*United States Dept. of Agriculture* v. *Moreno*, 413 U.S. 528 (1973) ............................................20

*Wayside Church v. Van Buren Cnty.*, 847 F.3d 812 (6th Cir. 2017) ............................................12

*Wegener v. City of Covington*, 933 F.2d 390 (6th Cir. 1991).....................................................28

*Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983) ...............................................................23

*Wolff* v. *McDonnell,* 418 U.S. 539 (1974) ......................................................................5, 26, 29

*Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006)........................................ 23-25

*Zinermon v. Burch*, 494 U.S. 113, 125 (1990)........................................................................25

**Constitutional Provisions**

Mich. Const. (1963), art. I, § 17.............................................................................................33

U.S. Const. Amend. XIV, § 1, cl. 3 .......................................................................................22, 29

U.S. Const. amend. XIV, § 1, cl. 4 .........................................................................................19

**Rules & Statutes**

Fed. R. Civ. P. 12(b)(1)...............................................................................................12, 13, 15

Fed. R. Civ. P. 12(b)(6)............................................................................................. 12-16, 31

Fed. R. Civ. P. 12(d) ............................................................................................................14

Fed. R. Civ. P. R. 56 ........................................................................................................ 14-16

Mich. Comp. Laws § 10.31.....................................................................................................3

Mich. Comp. Laws § 30.403...................................................................................................3

USCS Fed Rules Evid R 201 ...................................................................................................7

**STATEMENT OF FACTS**

I. **The Plaintiffs Are Fitness Centers, Each of Whom Is Prevented by the Defendants' Executive Orders from Providing Preventative Physical and Mental Health**

  Plaintiffs in this case are 22 individual companies that own and operate businesses, some in multiple locations, in the fitness industry, and the League of Independent Fitness Facilities and Trainers, Inc. ("LIFFT"), which is a trade organization with over 150 fitness centers across the state as members. It is estimated that statewide, there are 1,100 fitness centers and 1.5 million members that belong to Michigan health clubs.   Many of these are members of Plaintiffs' businesses.

  The fitness industry as a whole, and Plaintiffs in particular, have been severely impacted in the *17 ½ weeks* since Governor Whitmer's order closing the entire industry on March 16, 2020. Some of the Plaintiffs in this lawsuit may never reopen due to their inability to get any meaningful financial assistance to cover the complete loss of revenue. While revenue for most Plaintiffs has fallen by 80% or more, rent payments, utility payments, and many other vendor payments have continued (See **ECF 37-1**). Some Plaintiffs were able to apply for and received grants and aid under the Federal CARES Act, but those funds dried up weeks ago and needed to be spent over an eight-week period. All Plaintiffs (those who received federal money and those who were not eligible or otherwise could not get funding), are now once again in a position of not being able to keep the lights on in their facilities without draining personal savings accounts, borrowing from friends or relatives, or otherwise going into steep debt in order to try to survive what has turned out to be the whim of the Governor as to when they can reopen. (***Id***).  If Plaintiffs' businesses remain shuttered, many—if not most of them—will stay closed forever.

One of the many reasons that Plaintiffs want to reopen their businesses is to help the public in general (and their members specifically) in their ability to fight COVID-19. It is well documented that obesity, diabetes and hypertension are some of the highest risk factors that lead to a poorer outcome for Michiganders who contract COVID-19.[1] Physical exercise, both cardiovascular exercise and strength training, help improve the immune systems of those with at-risk factors associated with COVID-19.

Further, Plaintiffs are in a unique position to help those who have not contracted and may never contract COVID-19, but who are nonetheless struggling during these challenging times. Physical exercise has been proven to help people with their mental and emotional health. Researchers have found that exercise helps with both depression and anxiety, two mental conditions that people across Michigan are struggling with in the face of Defendants' lock down orders, social distancing, job loss, and coping with unwell family members. [2] Then too, a simple Google search will show that there have been ***no reported outbreaks at fitness centers*** throughout the United States. Yet in Michigan, the fitness industry has been deliberately closed by the Governor under threat of criminal prosecution, longer than any other industry.

---

[1] Centers for Disease Control and Prevention – Coronavirus Disease 2019 (COVID-19) "*Groups at Higher Risk for Severe Illness*" (Content source: National Center for Immunization and Respiratory Diseases (NCIRD) -  Division of Viral Diseases) available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed May 14, 2020).

[2] Wendy Suzuki, *The Brain-Changing Benefits of Exercise*, TED Conferences, LLC, November 2017, available at: https://www.ted.com/talks/wendy_suzuki_the_brain_changing_benefits_of_exercise?language=en; *See also* Sarah Gingell, Ph.D., *How Your Mental Health Reaps Benefits of Exercise*, Psychology Today, posted March 22, 2018, available at: https://www.psychologytoday.com/us/blog/what-works-and-why/201803/how-your-mental-health-reaps-the-benefits-exercise.

If permitted to reopen, there is no question that Plaintiffs will take all necessary precautions to prevent the transmission of COVID-19. In fact, two of the three letters sent to the Governor by the fitness industry (and attached to Plaintiffs' Complaint and First Amended Complaint) outlined potential plans for safely reopening with many restrictions. One such letter was sent by Plaintiff LIFFT (**ECF 33-1**, letter from LIFFT).  Signed by Tina Kinsley, MD, the President of LIFFT, the letter detailed at least 12 such guidelines. Among them were that all workouts will be conducted with stringent social distancing in place, dependent on the square footage of the space; all equipment, flooring and surfaces would be constantly cleaned with a disinfectant cleaner; employees will wear masks and, in some cases, face shields; members will have access to disinfecting materials to wipe down their workout areas before and after exercise; members will complete health assessment checks before working out; classes will be staggered if the facility is a class-based gym so that there would not be overlap between members; and finally, since many gym members check in before working out (unlike in many other industries), the fitness industry would keep records to assist with contact tracing in the event that a member tested positive.

## II.        Governor Whitmer Issues Executive Orders Declaring a State of Emergency

On March 11, 2020, Governor Whitmer issued Executive Order 2020-04, which proclaimed a state of emergency under both the Emergency Management Act ("EMA"), Mich. Comp. Laws § 30.403, and the Emergency Powers of the Governor Act of 1945 ("EPGA"), Mich. Comp. Laws § 10.31. (**ECF 33-2**). The order identified the COVID-19 pandemic as the basis for her declaration of a state of emergency under both statutory regimes.

On April 1, 2020, Governor Whitmer issued Executive Order 2020-33, which replaced Executive Order 2020-04, declared a state of emergency pursuant to the EPGA, and proclaimed a state of disaster and a state of emergency under the EMA. (**ECF 33-3**). These declarations were

based on the same circumstances—that is, the dangers posed by the virus that causes COVID-19—that formed the basis of Executive Order 2020-04.

On April 1, 2020, Governor Whitmer also requested that the Michigan Legislature extend the state of emergency by an additional 70 days, as contemplated by the EMA (until June 11, 2020). On April 7, 2020, the Michigan Senate and Michigan House of Representatives denied Governor Whitmer's request to extend the state of emergency for an additional 70 days (until June 11, 2020). Instead, the Michigan Legislature extended the state of emergency declared by Governor Whitmer until April 30, 2020, but not beyond.

## III.      Governor Whitmer Issues Several Executive Orders, ALL Prohibiting Business Operations of Gyms Where Even One Gym Member is in the Entire Studio

Meanwhile, Governor Whitmer issued many additional Executive Orders, invoking emergency powers that the Governor claims flow from the state of emergency declared under Executive Orders 2020-04 and 2020-33. As of June 2, 2020, Governor Whitmer has issued over 150 Executive Orders related to the COVID-19 pandemic, creating and changing substantive state law and regulations that impact and burden wide swaths of the economy.[3]

## IV.      Governor Whitmer Issues Several Orders Prohibiting Most In-Person Business Operations, Including the Operations of Gyms With Only One Member

On March 16, 2020, a mere five days after issuing Executive Order 2020-4 declaring a State of Emergency, Governor Whitmer issued Executive Order 2020-9, titled "Temporary Restrictions on Places of Public Accommodation" (**ECF 33-4**), her first of many Executive Orders closing gyms. After her initial Executive Order closing gyms and along with her myriad of other Executive Orders, Governor Whitmer issued *three more iterations* of Executive Orders to prohibit

---

[3] See https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455_98456_100804---,00.html

the uses of public accommodation, specifically Executive Orders 2020-20, 2020-43, and 2020-69 (**ECF 33-5 – 33-7**). These Executive Orders all applied to and made certain that gyms could not reopen. Further, amongst the "Frequently Asked Questions" on the state's coronavirus webpage, the Governor's office answered the following question four times in response to Executive Orders 2020-09, 2020-20, 2020-43, and 2020-69:[4]

> **Q:** Can gyms that offer service by private appointment remain open?
>
> A: All gyms are included in the definition of public accommodation under this Executive Order and are closed to ingress, egress, use, and occupancy by members of the public, including for private appointments.

In other words, even the largest gyms cannot operate a single personal training program for one trainer and one member, regardless of how many feet the two stood apart.

The Governor also issued six iterations of "Stay Home, Stay Safe" orders, specifically Executive Orders 2020-21, 2020-42, 2020-59, 2020-70, 2020-77, 2020-92, and 2020-96. (**ECF 33-8 – 33-14**). These Executive Orders were all titled "Temporary Requirement to Suspend Certain Activities That Are Not Necessary to Sustain or Protect Life." Each of the orders imposed sweeping limitations on Michigan citizens' ability to travel and prohibited countless numbers of employees in Michigan from reporting to work, including gym employees. Under all of the Stay Home, Stay Safe orders, a willful violation of the Executive Orders was a criminal misdemeanor.

## V.      The Governor Lifts (Almost) All Restrictions

On June 1, 2020, Governor Whitmer rescinded both Executive Order 2020-69 (the latest iteration of the Temporary Restrictions on Places of Public Accommodation Orders) and 2020-96 (the latest iteration of the Orders styled Temporary Requirement to Suspend Certain Activities

---

[4] *See* Michigan.gov, *Frequently Asked COVID-19 Questions*, available at: https://www.michigan.gov/coronavirus/0,9753,7-406-98810---,00.html?page=1&limit=100&filterCategories=&searchQuery= (last visited on June 5, 2020).

That Are Not Necessary to Sustain or Protect Life) and issued Executive Order 2020-110, titled "Temporary Restriction on Certain Events, Gatherings and Businesses." (**ECF 33-15**) Among other things, the Order rescinds the travel restrictions on Michigan residents, allows for outdoor gatherings of up to 100 people, allows indoor gatherings of up to 10 people, and allows restaurants, bars, and most other industries to open in some capacity. However, amongst the very few businesses still shuttered under her latest Order are indoor gyms (which, by definition, pertains to virtually all gyms). The Order even allows outdoor workouts and allows children to return to summer day camps. However, it is still a misdemeanor for a gym to hold any fitness classes—no matter how socially distanced—in their brick and mortar locations.

**VI.        The Governor Lifts Even More Restrictions on June 5, 2020**

On June 5, 2020, Governor Whitmer lifted even more restrictions in Michigan, but is still inexplicably keeping gyms closed throughout most of state, and still makes it a crime for most gyms to reopen. Governor Whitmer's latest Executive Order 2020-115 (**ECF 33-16**) allows gyms and other still-shuttered businesses to open on June 10, 2020 in the Upper Peninsula and a small portion of the northern part of the Lower Peninsula. On June 15, 2020, the Governor allowed hair salons, nail salons, tattoo parlors, massage therapists, and other "personal touch" businesses to finally re-open. Gyms must remain closed.

Defendants' purported rationale that indoor gyms and fitness facilities are uniquely dangerous does not stand to reason when you consider that the Government has already allowed the exact same facilities to reopen in other areas of the state. Additionally, Defendants have also allowed public universities, including the University of Michigan, to operate their indoor gyms and fitness

facilities for their student athletes, again seemingly without any consideration for their location.[5]
[6] [7]

Even further, *less than 24 hours* after the Sixth Circuit Court granted a stay to keep gyms shuttered, Defendants issued Executive Order 2020-133 allowing professional sports to resume operations – *including the operation of their indoor gyms and fitness facilities*.[8] [9]

## VII.    Governor Whitmer's Executive Orders Cause Enormous Confusion

### A.    Governor's Orders Cause Confusion

Almost immediately after her first stay-home order (Executive Order 2020-21) was issued, the Attorney General and the Governor were inundated with requests for clarification of the order. On March 24, 2020, Governor Whitmer observed, "We knew that there would be confusion, there always is."[10]

---

[5] *Michigan athletes return to campus, will be tested for COVID-19 (June 15, 2020)* <https://www.mlive.com/wolverines/2020/06/michigan-athletes-return-to-campus-will-be-tested-for-covid-19.html> (accessed July 2, 2020)

[6] This article was published after briefing was done on LIFFT's Motion for Preliminary Injunction and therefore was not previously attached; however, this issue was discussed at oral argument, and this article is attached by way of example.

[7] LIFFT requests, under USCS Fed Rules Evid R 201, that this Court take judicial notice of the fact that public universities were permitted to operate indoor gyms and fitness facilities for their student athletes as of June 15, 2020.

[8] *Executive Order 2020-133 (COVID-19) (June 25, 2020)*, <https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-533007--,00.html#:~:text=Executive%20Orders-,Executive%20Order%202020%2D133%20(COVID%2D19,)%20(June%2025%2C%202020)&text=The%20novel%20coronavirus%20(COVID%2D19,in%20serious%20illness%20or%20death.&text=On%20April%201%2C%202020%2C%20in,issued%20Executive%20Order%202020%2D33.> (accessed July 2, 2020).

[9] LIFFT requests, under USCS Fed Rules Evid R 201, that this Court take judicial notice of the recently issued Executive Order 2020-133.  See https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455_98456_100804---,00.htm

[10] Mikenzie Frost, *Gov. Whitmer says she understands confusion surrounding stay-at-home, urging patience*, WWMT, Mar. 24, 2020, available at https://wwmt.com/news/state/gov-whitmer-says-she-understands-confusion-surrounding-stay-at-home-urging-patience (last visited June 4, 2020).

On March 25, the Attorney General's office admitted, "I think it's a difficult executive order to really wrap your arms around."[11] The Attorney General's office explained that its process of clarifying the meaning of the order occurred on an ad hoc, case-by-case basis: "Every instance we get a call asking about whether or not businesses essential is being first reviewed by our office and then shared with the governor's office so that we can begin to get some clarity around the executive order." Despite the admitted confusion created by the orders, the Attorney General's office reiterated that violating the order could result in criminal penalties and forced closure of a business by law enforcement. [12] [13] In fact, the over 150 Executive Orders related to COVID-19 are so confusing that they are virtually impossible to understand. There are currently, as of July 14, 2020, a total of ***1,002* "Frequently Asked Questions"** regarding the various orders.[14]

Neither Governor Whitmer nor her spokeswoman appeared to know what the Executive Orders say on June 4, 2020. The Detroit News reported that the Governor appeared to be violating her own social distancing rules at a protest march in Detroit and asked for a comment from the Governor's office about her marching "shoulder to shoulder" with protesters, some of whom were

---

[11] Malachi Barrett, *Michigan Attorney General asks local law enforcement to handle violations of coronavirus stay home order*, MLive, Mar. 25, 2020, available at https://www.mlive.com/public-interest/2020/03/michigan-attorney-general-asks-local-law-enforcement-to-handle-violations-of- coronavirus-stay-home-order.html (last visited June 4, 2020).

[12] Virginia Gordan, *Local police to handle reports of violations of Gov. Whitmer's stay-at-home order*, Michigan Radio, Mar. 25, 2020, available at https://www.michiganradio.org/post/local-police-handle-reports-violations-gov-whitmers-stay-home-order (last visited June 4, 2020).

[13] As noted in the Plaintiffs' complaint, Defendant Gordon also issued an emergency order on April 2, 2020 (the "HHS order). The validity of the HHS order also relies upon the validity of the Governor's emergency declarations.

[14] *See* Michigan.gov, *Frequently Asked COVID-19 Questions*, available at: https://www.michigan.gov/coronavirus/0,9753,7-406-98810---,00.html?page=1&limit=25&filterCategories=&searchQuery= (last visited July 14, 2020).

not wearing masks. (**ECF 33-17**). Tiffany Brown, responding to the Detroit News, claimed that the Governor was not violating Executive Order 2020-110, stating that "[n]othing in this order shall be taken to abridge protections guaranteed by the state or federal constitution." (**ECF 33-17**). However, in the "Frequently Asked Questions" section of the Executive Order, it states as follows:

> **Q:** Does Executive Order 2020-110 prohibit persons from engaging in outdoor activities that are protected by the First Amendment to the United States Constitution?
>
> **A:** No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, **but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the person's household**.[15]

Subsequent to the protest march, Governor Whitmer admitted that she was not able to social distance at the protest.[16] Further, there are photos of her kneeling shoulder to shoulder with people who were not wearing any masks at all.[17] Therefore, if our Governor is signing Executive Orders that she is not following (or "cannot follow"), and her staff does not know how the Governor's Orders are applied, there is a very high likelihood of confusion for the 10,000,000 other residents of Michigan. In fact, pursuant to Executive Order 2020-110, the conduct of the Governor is a misdemeanor if it was a "willful violation."

---

[15] *See* Michigan.gov, *Executive Order 2020-110 FAQs*, available at: https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-530654--,00.html (last viewed June 4, 2020).

[16] *See* Justin P. Hicks, *Gov. Whitmer responds to lack of social distancing at protests against police brutality*, MLive, June 5, 2020, available at: https://www.mlive.com/public-interest/2020/06/gov-whitmer-responds-to-lack-of-social-distancing-at-protests-against-police-brutality.html (last updated June 5, 2020).

[17] *See* Craig Mauger and James David Dickenson, *With little social distancing, Whitmer marches with protesters*, The Detroit News, June 4, 2020, available at: https://www.detroitnews.com/story/news/local/michigan/2020/06/04/whitmer-appears-break-social-distance-rules-highland-park-march/3146244001/ (last updated on June 4, 2020; last visited on June 7, 2020).

## B.      The Governor's Executive Orders are Arbitrary

The Governor's Executive Orders that permit some industries to reopen, on top of being vague and confusing, are entirely arbitrary. People have been allowed to patronize recreational marijuana dispensaries, liquor stores, and purchase lotto tickets the entire time that Michigan state has been under a state of emergency.[18] People can also gather in groups of 10 indoors, as long as they socially distance. Accordingly, 10 friends can now get together in someone's living room and perform the same workout together that they would do at a professional gym, as long as they are six feet apart. But still, under Executive Order 2020-115, gyms are closed.[19] People can visit a strip club, have their teeth bleached, get Botox, lip injections, and even liposuction (all previously considered "non-essential" and which are not conducive to any social distancing of any kind). But they cannot go to a gym. Starting June 15, 2020, Michigan residents can get their hair cut, their nails manicured, get a tattoo, and even get a massage. Again, none of these industries can operate with any kind of social distancing. People can gather in groups of 100 outdoors, visit a bicycle repair shop, and buy clothes at a mall. People may now go swimming at their favorite public or private pool, practice recreational team sports, and kids can attend camp. Further, collegiate and professional sports athletes have unfettered access to and use of their indoor gyms.  But owners of gyms, who are experts at knowing how to sterilize and open their businesses safely, cannot perform the same business services that ordinary citizens are allowed to do with others at home and that

---

[18] Liquor sales and lottery ticket sales also happen to also be an enormous source of revenue for the state.

[19] Although the Governor's Orders 2020-110 and 2020-115 allow for "outdoor" workouts, Michigan's weather, as well as the costs and fees for park permits render the "permission" entirely useless. Further, Plaintiffs submit that the Governor cannot unilaterally change their business models under the United States Constitution.

collegiate and professional athletes are allowed to do in gyms identical to Plaintiffs' facilities. Gyms cannot even sell clothing or other health items, even though the rest of the economy is open.

The Governor was also critical of "choirs" at a recent news conference as a potential cause of an outbreak. Nonetheless, under her current Executive Order, choirs can resume in churches, up to 100 people can gather outdoors for a choir practice, and up to 10 people can gather indoors for a choir practice. Meanwhile, it is a crime for those same people to leave choir practice and go to a gym. They can go to a bar, go out to eat at a restaurant, go clothes and shoe shopping, and go golfing while riding in a golf cart next to another person, but it is still a crime for a gym owner to open his or her facility to help citizens improve their physical and mental health.

The Governor claims that she is following "data and science" to make her reopening decisions. However, at a recent press conference on June 1, 2020, the Governor stated as follows: "In the early days, I often would observe because some of the best science was saying COVID-19 can stay active and can be picked up from a stainless-steel surface for days. That was the original science. That's what they were saying. Now that seems less certain."[20] The reason for that admission was simple. The Center for Disease Control has updated their research results and no longer believes that touching surfaces is nearly as dangerous as it initially reported in March 2020.[21] However, despite her admission that the data and science has changed since her initial closure of gyms, she refuses to reopen them in the bulk of the lower peninsula,

---

[20] *Michigan Governor Gretchen Whitmer Press Conference Transcript June 1*, available at: https://www.rev.com/blog/transcripts/michigan-governor-gretchen-whitmer-press-conference-transcript-june-1 (last visited June 8, 2020).

[21] *See* Julia Ries, *CDC Gives New Recommendations to Safely Reopen Amid COVID-19*, Healthline, May 21, 2020 (fact checked by Jennifer Chesak) available at: https://www.healthline.com/health-news/new-cdc-guidelines-say-covid-19-unlikely-to-spread-via-contaminated-surfaces#Restaurants-and-bars.

leaving tens of thousands of people out of work, and keeping over a million of Michigan citizens

from one of the most important pieces of overall physical and emotional health.

The Governor's rationale is that by keeping gyms closed, she is keeping people safer. That is a

fallacy. There is no data or science to support this proposition, particularly when she has

reopened nearly all of the other industries that she initially considered an immediate danger to

the public health. The data that the Governor believed to be true about the virus easily spreading

on surfaces has largely been debunked. The staggering death tolls that experts predicted in

March have not come even close to reality. There is no data or science backing her position that

keeping gyms shuttered longer than any other industry is keeping Michigan residents safe. In

fact, the opposite is true: Michigan's mental and physical health is declining by the day. The only

scientific certainty is that the Michigan residents are becoming more susceptible to severe

complications of COVD-19 and are becoming more depressed, anxious, and stressed.

## STANDARD OF REVIEW

Defendants bring their motion to dismiss for failure to state a claim under both Fed. R. Civ.

P. 12(b)(1) and 12(b)(6).[22] (*See* **ECF No. 41-1, PageID 861**). A 12(b)(1) motion provides for

dismissal of an action for lack of subject matter jurisdiction. 12(b)(1) motions can challenge the

sufficiency of the pleadings to establish jurisdiction (facial attack) or a lack of factual support for

subject matter jurisdiction, despite the pleading's sufficiency (factual attack). *See Wayside Church

v. Van Buren Cnty.*, 847 F.3d 812, 816-17 (6th Cir. 2017). Here, Defendants assert only a facial

attack on the pleadings. (*See* **ECF No. 41-1, PageID 861-62**). For facial attacks on the pleadings,

this Court must accept all allegations in the complaint as true and draw all reasonable inferences

---

[22] A motion for failure to state a claim is prescribed under 12(b)(6) only. Alternatively, 12(b)(1) operates to dismiss an action for lack of subject matter jurisdiction – which Defendants seemingly fail to acknowledge in its motion.

in favor of the nonmoving party.[23] *Wayside* at 816 (citation omitted); *see also Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012). This Court has acknowledged that a motion alleging lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). *See Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008). The plaintiff bears the burden of proving the existence of subject matter jurisdiction. *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).

In turn, a 12(b)(6) motion provides for dismissal of an action for failure to state a claim. A motion to dismiss under Rule 12(b)(6) is distinct both substantively and procedurally from a motion to dismiss under 12(b)(1), but employs the same safeguard requiring this Court to take the allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Perry v. McGinnis*, 209 F.3d 597, 602 (6th Cir.2000); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007). A fundamental difference between 12(b)(1) and 12(b)(6) motions is not in the procedures used, but in the effect the ruling will have upon the parties. *Ohio Nat'l Life Ins. Co.* at 325. A dismissal under 12(b)(1) permits the plaintiff to replead the action to bring it within the subject matter jurisdiction of some court. *Id*. In contrast, a dismissal under 12(b)(6) is generally a dismissal with prejudice, but can be without prejudice in certain instances. *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999).

---

[23] Defendants cite to caselaw from the 11th Circuit to improperly assert that "this Court *may* make inferences in the non-moving party's favor, but [this Court is] not required to draw [p]laintiffs' inference." (**ECF No. 41-1, PageID 861** (emphasis added and internal quotations omitted)). However, controlling authority in the 6th Circuit mandates these inferences. *See Ohio Police & Fire*, 700 F.3d at 835 ("We *must* construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." (emphasis added)).

A complaint survives a 12(b)(6) motion to dismiss so long as it contains sufficient factual matter to state a claim to relief that is plausible (not "probable") on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff's claim has facial plausibility when it pleads factual content that allows the court to draw some reasonable inference that the defendant is liable for the alleged misconduct. *Id.* (citation omitted). Accordingly, this Court's inquiry on a 12(b)(6) motion – *before the reception of any evidence or materials outside the pleadings* – is merely whether the challenged pleading sets forth allegations sufficient to construe the elements of a claim to relief. *See Batsakis v. Fed. Deposit Ins. Corp.*, 670 F. Supp.749, 752 (W.D. Mich. 1987) (quotations omitted). Dismissal under a 12(b)(6) motion can only be granted if it is *clear beyond doubt* that the plaintiff cannot possibly prove any set of facts in support of his claim that would entitle him to relief. *Perry* at 602. The defendant bears the burden of showing that the plaintiff's claim fails to state a plausible claim for relief. *Taylor v. City of Saginaw*, 922 F.3d 328, 331-32 (6th Cir. 2019).

Meanwhile, when a party files a motion to dismiss under 12(b)(6), the district court is instructed to treat it as a Rule 56 motion for summary judgment if either party submits additional materials 'outside the pleadings.' *Ohio Nat'l Life Ins. Co.* at 325.[24] Indeed, even if the defendants maintain that the motion is brought under 12(b)(6), this Court can convert the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d) (stating "[i]f, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"). Consequently, the plaintiff

---

[24] Although, generally, it is improper for this Court to consider matters outside of the pleadings on a motion to dismiss, this Court may consider documents specifically referenced within the pleadings themselves, so long as they are central to the plaintiff's claim. *See Greenberg v. Life Ins. Co. of Va,* 177 F.3d 507, 514 (6th Cir. 1999).

is provided with additional safeguards since a Rule 56 motion operates as a ruling on the merits of the claim(s). *Ohio Nat'l Life Ins. Co.* at 325. In addition to requiring this Court to take all of the plaintiff's allegations as true, with all their favorable inferences, this Court cannot grant a summary judgment unless there is no genuine issue of material fact. *Id.*; *see also RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). A grant of summary judgment under Rule 56 resolves the issue on the merits and is with prejudice. *Ohio Nat'l Life Ins. Co.* at 325.

## ARGUMENT

Defendants ask this Court to dismiss this action based on 12(b)1 and 12(b)(6). Defendants assert facial attacks on subject matter jurisdiction, then launch the tenuous contention that Plaintiffs' complaint fails to state a claim upon which relief can be granted. None of these arguments have merit.

At the outset, when a defendant moves to dismiss an action under both 12(b)(1) and 12(b)(6), this Court should first consider the 12(b)(1) motion, since the 12(b)(6) motion is moot if subject matter jurisdiction does not exist. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Accordingly, Plaintiffs first address the justiciability of the claims, followed with a dissection of Defendants' challenge under 12(b)(6).

### I. Plaintiffs' Stated Claims are Justiciable

#### A. Plaintiffs have standing under the law of this case.

Plaintiffs rely upon their arguments from their Reply to Defendants' Brief Opposing their Motion for Preliminary Injunction and incorporate them here as though fully restated herein. (**PageID.520-521**). More importantly, this Court already made a ruling that Plaintiffs have

standing to bring their claims. (**PageID.1109-1111**). Thus, it is the law of the case. *See Brady-Morris v. Schilling (In re Kenneth Allen Knight Tr.)*, 303 F.3d 671, 676 (6th Cir. 2002).

### B.      Plaintiffs do not contest the assertion of sovereign immunity.

Plaintiffs do not contest Defendants' assertion of sovereign immunity with respect to their state law claims (Counts VIII and IX).

## II.      Plaintiffs' Stated Claims are Viable

Defendants argue the merits of Plaintiffs' claims, yet utterly fail to acknowledge that they brought their motion to dismiss pursuant to 12(b)(6), under which this Court's sole objective  is to determine whether Plaintiffs state a claim – not whether they are likely to prevail. *See Iqbal*, 556 U.S. at 678 (holding that "[t]he plausibility standard is not akin to a 'probability requirement'…"). Indeed, at the pleading stage (and with application of the proper legal standard for the same) Defendants' burden is very high under *Iqbal*, and Plaintiffs need only plead a *plausible* claim for relief, not prove their case. Plaintiffs' Complaint satisfies that low threshold.

Alternatively, should this Court determine that consideration of any documents or materials outside the instant pleadings converts this motion into a Rule 56 motion for summary judgment, Defendants' motion still fails for its inability to demonstrate that no genuine issue of material fact exists. *See Ohio Nat'l Life Ins. Co.* at 325.

### A.      Defendants' reliance on *Jacobson* is misguided as the EOs are both arbitrary and unreasonable.

The Defendants' reliance upon *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), is not the magic bullet they purport it to be. Defendants cite *Jacobson* in support of the argument that the State's conduct taken in response to a pandemic is virtually unreviewable by a court. But in fact, *Jacobson*—which involved only a compulsory smallpox vaccination, not a months-long shutdown of the entire economic and social activity of a State—does not advocate limitless deference to the

executive in an epidemic. Instead, a regulation "purporting to have been enacted to protect the public health, the public morals, or the public safety" is valid only if it has a "real or substantial relation to those objects." *Jacobson*, 197 U.S. at 31. "[The] acknowledged power of a local community to protect itself against an epidemic threatening the safety of all <u>might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons</u>." *Id*. at 28 (emphasis added). The executive orders that are at issue in this case go well beyond the scope of permissible state action in response to an epidemic.

Although Jacobson's core holding remains sound (that States retain their police power to act in the interest of public health), Plaintiffs contend that modern due process and equal protection jurisprudence has overtaken Jacobson's standard of review. Today, courts must apply strict scrutiny where a public health regulation infringes upon a fundamental right. Alternatively, courts must apply intermediate scrutiny when a public-health regulation treats people differently based on a protected classification and in certain First Amendment contexts. Indeed, this Court has ruled that modern strict scrutiny applies when fundamental rights are at issue, including the instant matter. *See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, —F.3d—, No. 20-1581; 2020 WL 3468281 (6th Cir. Jun. 24, 2020) ("LIFFT") (applying rational basis, but noting that fundamental rights are subject to higher scrutiny); *see also Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020). Consequently, Jacobson's reasonableness standard applies only when strict or intermediate scrutiny do not apply.

The EOs at issue here are plainly arbitrary and unreasonable, and Defendants' argument that Plaintiffs' businesses are uniquely dangerous is entirely disingenuous. To start, there are a

number of businesses currently allowed to operate that plainly demonstrate the complete arbitrary and unreasonable nature of the EOs. Those businesses include: (1) restaurants, (2) hookah lounges, (3) overnight indoor cheerleading, hockey and basketball camps, (4) private citizens having 50 people over to work out in their home, (5) choir practices and overnight choir camps, (6) physical therapy facilities, (7) and all "personal touch" businesses, such as tattoo parlors, massage parlors, hair salons, nail salons, etc. This list clearly demonstrates that concerns about heavy breathing, sweating, close contact, and shared surfaces simply cannot be the rational basis for shuttering gyms and workout facilities.

It is not rational to shutter gyms and workout facilities on the basis of heavy breathing, while simultaneously holding that overnight indoor sports camps, choir practices, overnight choir camps, and 50-person private workout sessions are acceptable. It cannot be argued that the EOs are based in logic or reason when Defendants shutter gyms and workout facilities based on a perceived risk of close contact and shared surfaces, while simultaneously holding that restaurants, hookah lounges, physical therapy facilities, tattoo parlors, massage parlors, hair salons, and nail salons are allowed to open.

Defendants' purported rationale that Plaintiffs' businesses are uniquely dangerous does not stand to reason when you consider that Defendants currently allow the exact same facilities to operate in other areas of the state. Additionally, Defendants have allowed public universities, including the University of Michigan, to operate their indoor gyms and fitness facilities for their student athletes, again seemingly without any consideration for their location.[25]

---

[25] *Michigan athletes return to campus, will be tested for COVID-19*, MLive, June 15, 2020 <https://www.mlive.com/wolverines/2020/06/michigan-athletes-return-to-campus-will-be-tested-for-covid-19.html> (last accessed July 14, 2020); *Michigan football embraces new normal: 'We don't want any setbacks'*, Detroit Free Press, July 1, 2020 <https://www.freep.com/story/sports/college/university-

Even further, less than 24 hours after Defendants petitioned the Court of Appeals to keep gyms shuttered, Defendants issued Executive Order 2020-133 allowing professional sports to resume operations – *including the operation of their indoor gyms and fitness facilities*![26]

To restate the absurdity of the Defendants' purported rationale and the arbitrary nature of these orders, Plaintiffs' businesses are supposedly too dangerous to operate while the *exact same businesses* are allowed to operate if they are located in Regions 6 and 8 of the state or if they are operated by a collegiate or professional sports team. The arbitrary and unreasonable nature of these EOs is entirely self-evident.

Given what is pleaded in Plaintiffs' Complaint—independent of, but strengthened by, public developments that have since come to light—Plaintiffs have credibly challenged whether Defendants' action and the EOs at issue are arbitrary, oppressive, and so far beyond what is reasonably required for public safety, that they constitute a plain and palpable invasion of Plaintiffs' Constitutional rights.

### B. Plaintiffs' Equal Protection Claim is viable.

Plaintiffs have stated a viable claim for relief under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment provides that no State can "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. Accordingly, State action that regulates economic activity in a

---

michigan/wolverines/2020/07/01/michigan-football-kwity-paye-campus-workout-precautions/3285112001/> (accessed July 14, 2020).

[26] *Executive Order 2020-133 (COVID-19) (June 25, 2020)*, <https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-533007--,00.html#:~:text=Executive%20Orders-,Executive%20Order%202020%2D133%20(COVID%2D19,)%20(June%2025%2C%202020)&text=The%20novel%20coronavirus%20(COVID%2D19,in%20serious%20illness%20or%20death.&text=On%20April%201%2C%202020%2C%20in,issued%20Executive%20Order%202020%2D33.> (last accessed July 14, 2020).

discriminatory manner violates the Equal Protection Clause unless the State can show a "rational relationship between the disparity of treatment," along with some "legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001). Under no circumstances can a State "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (citation omitted); *see also United States Dept. of Agriculture* v. *Moreno*, 413 U.S. 528, 535-38 (1973) (holding that the classification at issue was not only 'imprecise,' but was utterly want of any rational basis).

To state an equal-protection claim, a plaintiff must plead that: (1) the government treated him differently than another, similarly situated person; and (2) this difference in treatment burdens a fundamental right, targets a suspect class, or has no rational basis. *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). Plaintiffs have sufficiently pled disparate treatment, in relation to similarly situated businesses, with regards to fundamental rights, without being narrowly tailored (or having any reasonable relation) to a compelling (or legitimate) governmental interest. (**ECF No. 16, PageID.176-178**).

Plaintiffs maintain that the Supreme Court's decision in *City of Cleburne* is aligned with the instant matter to exemplify how such arbitrariness or irrationality may be identified. In *Cleburne*, the Supreme Court struck down a zoning ordinance that required a special use permit for a home for individuals with disabilities ("Featherstone Home"), but did not require the same special use permit "for apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged . . ., private clubs or fraternal orders and other specified uses." *City of Cleburne*, 473 U.S. at 447.

The Court acknowledged that, while individuals with intellectual disabilities may have unique needs, such difference is patently irrelevant unless the Featherstone Home and its occupants would threaten legitimate city interests in a way that other permitted uses such as boarding houses, fraternity or sorority houses, hospitals, private clubs, etc. would not. *Id*. at 448. In conclusion, the Court found that the record did not reveal "any rational basis for believing that the Featherstone Home would pose any special threat to the city's legitimate interests." *Id*.

Similarly, in this case, while responding to a health crisis is a legitimate governmental purpose, such purpose does not rationalize any and all State action. And, similar to *Cleburne*, Defendants have yet to provide *any* data-supported justification whatsoever for imposing these greater restrictions. The single "study" cited by Defendants, a research letter authored by the CDC, does not support Defendants' implementation of these disparate, heighted restrictions on fitness centers.[27] Further, the study was from February 15, 2020, in South Korea, where there were no social distancing measures in place as South Korea was just beginning to understand the threat.

Instead of providing a rational basis for these disparate, heightened restrictions, Defendants merely assert a conclusory argument that "each challenged restriction has a rational basis" before referencing a series of lesser restrictions that are not even an option for Plaintiffs: "it makes eminent sense to adopt measures that require social distancing, limit person to person contact, and preserve valuable health care resources." (ECF No. 41-1, **PageID.893**). To be clear, Defendants' restrictions on Plaintiffs' businesses do not merely require social distancing, the limitation of person to person contact, or the preservation of valuable health care resources. These heightened restrictions instead outright ban Plaintiffs from operating as a gym at their brick and mortar locations no matter how much the facility complies with these other, less restrictive precautions.

---

[27] https://wwwnc.cdc.gov/eid/article/26/8/20-0633_article

21

Defendants' ability to provide a rational basis for these heightened restrictions is even more questionable when you consider that, by means of other EOs, Defendants currently allow the exact same businesses to operate if they are located in Regions 6 and 8 of the state, or if they are operated by a collegiate or professional sports team. The arbitrary implementation and disparate treatment make it clear that Plaintiffs have stated a viable Equal Protection claim. Moreover, the above highlights the kind of fact-based merit questions that Plaintiffs have a right to explore during discovery, which is well beyond the pleading stage, under which Defendants have brought their motion. Indeed, this Court's analysis stops once this Court concludes that Plaintiffs have sufficiently pled their Equal Protections claims, which they have. (*See* **ECF No. 16, PageID.176-178**). Alternatively, Plaintiffs' have sufficiently demonstrated that genuine issues of material fact exist as to whether the EOs at issue apply disparate treatment, in relation to similarly-situated businesses, with regards to fundamental rights, without being narrowly tailored (or having any reasonable relation) to a compelling (or legitimate) governmental interest. Accordingly, Plaintiffs' viable Equal Protection claim should not be dismissed.

### C.   Plaintiffs' Procedural Due Process Claim is viable.

Plaintiffs have stated a viable claim for relief under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. The Due Process Clause provides that no state can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1, cl. 3. Procedural due process imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)[28]. Accordingly, a procedural due

---

[28] Plaintiffs, as private corporations, constitute persons within the meaning of the Due Process Clause. *S. Macomb Disposal Auth. v. Washington*, 790 F.2d 500, 503 (6th Cir. 1986).

process claim is achieved upon showing: (1) a life, liberty, or property interest requiring protection under the Due Process Clause; (2) a deprivation of that interest; (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (citation omitted). Plaintiffs' Complaint sufficiently pleads all three elements. (**ECF No. 16, PageID.164-174**).

1.   **Plaintiffs have legitimate, constitutionally protected, liberty and property interests.**

Liberty interests categorically include the right of an individual to contract, to engage in any of the common occupations of life, and generally to enjoy those privileges long recognized as essential to the ordinary pursuit of happiness by free men and women. *Women's Med Prof'l Corp*, 438 F.3d at 611 (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (therein quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (quotations omitted)). Property interests are those that one has already acquired in specific benefits. *Board of Regents*, 408 U.S. at 576.

Fundamentally, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med Prof'l Corp*, 438 F.3d at 611 (citing *Board of Regents*, 408 U.S. at 577). Meanwhile, the Constitution protects one's liberty to choose his or her career or occupation. *Women's Med Prof'l Corp*, 438 F.3d at 612. Consequently, "[l]iberty and property interests are intricately related in our system of political economy, a system based on free choice of careers and occupations, private property, and the right to compete." *Id.* (citing *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983). In taking all the above-mentioned case law together, the Court in *Women's Med Prof'l Corp* unequivocally held that the continued operation of an existing business is an interest that is afforded due process protections. *Id.* at 611.

Here, Plaintiffs are established businesses that were fully operational prior to the EOs in question. Thus, Plaintiffs clearly have property interests in the businesses themselves, as well as liberty interests in the right to intrastate travel and the freedom to engage in the operation of their businesses. Accordingly, the first element of Plaintiffs' procedural due process claim is met.

### 2. Defendants have deprived Plaintiffs' of their constitutionally protected liberty and property interests.

Notably, neither liberty nor property interests may be obstructed by a legislative action that is under the guise of protecting the public interest yet is "arbitrary _or_ without reasonable relation to some purpose within the competency of the State to effect." *Meyer*, 262 U.S. at 399-400 (emphasis added). The Sixth Circuit in *Women's Med Prof'l Corp* recognized that, while there is merit to the contention that there is no unfettered freedom to engage in a business that may be properly regulated under a state's general police power, such contention does not resolve the issue of whether one's clear liberty to engage in that business was _properly constrained_ under the state's police power. *Id*. (citing *Sanderson v. Village of Greenhills*, 726 F.2d 284, 285 (6th Cir. 1984). It therefore follows that, regardless of the validity of Defendants' police powers and resulting EOs in times of emergency, Defendants cannot improperly deprive Plaintiffs of their liberty and property interests without due process.

Undoubtedly, Plaintiffs here have been – and continue to indefinitely be – deprived of their protected liberty and property interests under the improper restraints of the EOs. Beginning March 16, 2020, the Governor's Orders abruptly forced the immediate closure of "places of public accommodation," including gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, and spas. (**ECF 33-2 – 33-16**). Plaintiffs immediately closed their businesses and ceased all operations. To date, four months and counting

since the initial forced shutdown, Plaintiffs remain closed under threat of significant criminal penalties and civil fines.

Simply put, the EOs arbitrarily and improperly deprive Plaintiffs of their rights and freedoms to engage in their business operations. Accordingly, the second element of Plaintiffs' procedural due process claim is met.

### 3. Defendants have provided no process when depriving Plaintiffs of their constitutionally protected liberty and property interests.

The fundamental requirement of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner," so as to allow vindication of the protected interests that are being improperly restricted. *Mathews v Eldridge*, 424 U.S. at 319; *Board of Regents*, 408 U.S. at 577. A due process violation is not established when the deprivation of a constitutionally interest occurs; rather, the deprivation occurs when the State fails to provide due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citation omitted). Procedural due process is not meant to protect persons from the deprivation itself, but from the mistaken or unjustified deprivation of the protected liberty and property interests. *Id*. at 125-26. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. *Id*. at 126.

The United States Supreme Court has long established that due process is a flexible concept that calls for varying procedural protections according to the demands of the particular situation. *Id*. at 127; *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972). Additionally, **where the State must act swiftly, or where it would be impractical to provide a pre-deprivation process, due process may be satisfied, so long as the State provides a post-deprivation process**. *See, e.g.*, *Women's Med. Prof'l Corp*. 438 F.3d at 613; *see also Zinermon* v. *Burch,* 494 U.S. at 128

(collecting cases); *Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *United States* v. *James Daniel Good Real Property,* 510 U.S. 43, 53 (1993) (additional citations omitted).

Recently, the Supreme Court of Pennsylvania (Middle District) ruled on a similarly-situated case involving Fourteenth Amendment procedural due process and equal protection claims brought by four businesses and one individual who had been forced to close their businesses under the Pennsylvania Governor's police powers, amid the current COVID-19 concerns. *Friends of Devito v. Wolf*, ___A3d___; 2020 Pa. LEXIS 1987 (Apr. 13, 2020) (**ECF 33-18**). In *Devito*, the petitioners operated businesses, which the State classified as "non-life-sustaining." *Id.* at *1, 12-15. Petitioners asserted claims that the Pennsylvania Governor lacked statutory authority to issue the Executive Order, and that the forced closure of their businesses infringed upon their Constitutional rights. Of particular import is the court's holding regarding the procedural due process claims.

In *Devito*, the petitioners claimed that the Executive Order, which listed and distinguished the permissible operation of "life-sustaining" businesses from the impermissible operation of "non-life-sustaining" businesses, took effect without providing petitioners with pre-deprivation notice and an opportunity to be heard with respect to their classification as non-life-sustaining businesses. *Id*. at *52. Meanwhile, the Pennsylvania Governor announced and provided a waiver application process, which afforded businesses the (post-deprivation) opportunity to challenge the Pennsylvania Governor's placement of their business on the non-life-sustaining list. *Id*. at *57. Still, petitioners argued that any waiver process provided by the State "must accord applicants procedural due process prior to final determinations, including, *e.g*., the right to know the applicable standards to be applied, to present and/or cross-examine witnesses, and to the availability of an appeal from an adverse result." *Id*.

The court acknowledged that, **even in times of emergency, petitioners were absolutely entitled to procedural due process protections**. *Id*. at \*55-56. The court's holding hinged on whether petitioners' liberty and property interests were afforded adequate process via the post-deprivation waiver process. *See id., generally* at \*52-63. In its analysis, the court applied the three-part balancing test established in *Mathews v. Eldridge* to consider (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state. *Mathews*, 424 U.S. at 334-35.

Ultimately, the court held that, given the circumstances of an ongoing disaster emergency, a full evidentiary proceeding was not a viable post-deprivation procedural process, whereas the waiver process was indeed adequate. *Devito* at \*61. The court found that the waiver process functioned as a review process, in providing businesses an opportunity to challenge – and the Governor's office to reconsider – the propriety of the non-life-sustaining categorization. *Id.* at \*57. The court concluded that the Governor's efforts to correct mis-categorizations of certain businesses is an entirely proper focus of procedural due process. *Id.* at \*57-58.

Significantly though, what glaringly distinguishes *Devito* from the instant case is that neither Governor Whitmer, Director Gordon, nor any of the EOs at issue have attempted to provide ***any*** procedural due process safeguards at all. Likewise, absolutely no mechanism of any kind has been announced or provided for post-deprivation review. Defendants argue *no process* is required—ever—if it classifies its actions as "temporary" and not "final," citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). (**ECF No. 41-1, PageID.889**). But Defendants misconstrue *Mathews*. The length of the deprivation is a factor in how much process is due; but some process

is due so long as the deprivation is more than *de minimis*. *Goss v. Lopez*, 419 U.S. 565, 575–576 (1975); *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972). Defendants' shuttering of Plaintiffs' businesses for months on end meets this low threshold, for which some process is indeed required. Cf. *Wegener v. City of Covington*, 933 F.2d 390 (6th Cir. 1991) (holding that a § 1985 claim premised on a theory that a fire captain and police lieutenant conspired to shut down a lawful business early, for one night, without due process was sufficient to state a claim).[29]

And, contrary to Defendants' inaccurate assertions, Plaintiffs presentation of *Devito* is not merely to suggest that Michigan should implement the same post-deprivation waiver process as Pennsylvania did in that case. (*See* **ECC No. 41-1, Page ID.890**). Rather, *Devito* demonstrates that, even amid the current COVID-19 circumstances, process is absolutely due to protect businesses from mistaken or unjustified deprivations of liberty and property interests. Thus, the crux of Plaintiffs' argument is to solidify the point that this Court cannot even consider whether process was adequate under a *Matthews* three-part balancing test because, put simply, there is no process available at all. And, by utterly failing to provide any pre- or post-deprivation review of the orders and rules shuttering Plaintiffs' business, Plaintiffs are perpetually suffering substantial losses of liberty and property. Accordingly, the third and final element of Plaintiffs' procedural due process claim is met.

Crucially, Defendants' challenge to Plaintiffs' Procedural Due Process claim utterly disregards the appropriate standard of review in their motion. Defendants argue that "Plaintiffs can

---

[29] Once it is determined that process is required, the *Mathews* balancing test guides how much process is due. Defendants suggest that *Mathews* is not the right test because the EOs are general, emergency orders, but it offers no alternative method by which to decide how much process is due. Plaintiffs maintain that *Mathews* remains the appropriate standard here. After all, the Supreme Court has applied the *Mathews* test even in wartime. *See, e.g.*, Hamdi v. Rumsfeld, 542 U.S. 507 (2004) (applying the *Mathews* test to determine how much process to give an unlawful enemy combatant).

point to nothing to indicate that, given this particular situation, due process would demand that they be afforded any further procedural protections." (**ECF N0. 41-1, PageID.891**) (internal quotations and citation omitted). However, Plaintiffs need not point to anything to prove if or why additional procedural protections are warranted. Rather, Plaintiffs need only plead a plausible claim to the procedural protections of due process, which Plaintiffs have aptly done. (**ECF No. 16, PageID.164-174**). Alternatively, Plaintiffs' arguments concerning their procedural due process claim have sufficiently demonstrated that genuine issues of material fact exist as to whether Defendants have deprived Plaintiffs of their protected liberty and property interests under the improper restraints of the EOs. Accordingly, Plaintiffs' viable Procedural Due Process claim should not be dismissed.

> **D.     Plaintiffs' Substantive Due Process Claim is viable.**

Plaintiffs have stated a viable claim for relief under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The Due Process Clause provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3. The Supreme Court has repeatedly emphasized that "the touchstone of due process is protection of the individual against arbitrary action of government." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1716 (1998), *citing Wolff* v. *McDonnell,* 418 U.S. 539, 558, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974)[30]. The substantive component of the Due Process Clause prohibits government from taking action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987). More recently, in *Collins v. Harker Heights*, the Supreme Court

---

[30] Plaintiffs, as private corporations, constitute persons within the meaning of the Due Process Clause. *S. Macomb Disposal Auth. v. Washington*, 790 F.2d 500, 503 (6th Cir. 1986).

stated that the substantive component of the Due Process Clause is violated by executive action when "it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." 503 U.S. 115, 128  (1992)

The EOs arbitrarily and improperly deprive Plaintiffs of their rights and freedoms to engage in their business operations. These indefinite deprivations have gone on for four months with seemingly no end in sight. As discussed in further detail above, the EOs in question are demonstrably arbitrary on a number of levels. There are a number of businesses currently allowed to operate within the framework of the EOs despite sharing the same purported concerns Defendants attribute to gyms.  Additionally, Defendants argue that Plaintiffs' businesses are too dangerous to open with any restrictions, while simultaneously holding that the exact same businesses are able to open in other regions of the state. Even further, by means of EO 2020-133, Defendants have allowed professional sports teams to operate their gyms and fitness facilities, regardless of location. The same can be said for public universities, including University of Michigan, who has also been given the green light to operate its gyms and fitness facilities for its student athletes. The arbitrary nature and application of the EOs in question is abundantly clear.

The EOs interfere with rights implicit in the concept of ordered liberty and shock the conscience. As detailed above, Plaintiffs have been – and continue to indefinitely be – deprived of their protected liberty and property interests under the improper restraints of the EOs. Beginning March 16, 2020, the Governor's Orders abruptly forced the immediate closure of Plaintiffs' businesses. To date, four months and counting since the initial forced shutdown, Plaintiffs remain closed under threat of significant criminal penalties and civil fines. Plaintiffs have been wholly deprived of their right to Due Process, and their claim regarding the same is viable.

Plaintiffs again emphasize that Defendants brought a Rule 12(b)(6) motion. The Court must therefore accept Plaintiffs' well-pleaded facts as true, not the counter-narrative that Defendants are trying to force upon this Court. With the appropriate standard in mind, Plaintiffs maintain that they have pleaded a plausible claim that Defendants have violated their substantive due process rights under the standards for fundamental rights, protected liberty interests, and arbitrary and capricious action. Alternatively, Plaintiffs' arguments concerning the same have sufficiently demonstrated that genuine issues of material fact exist as to whether Defendants have deprived Plaintiffs of their protected liberty and property interests under the improper restraints of the EOs. Accordingly, Plaintiffs' viable Substantive Due Process claim should not be dismissed.

### E.   Plaintiffs' Dormant Commerce Clause Claim is viable.

Plaintiffs have stated a viable claim for relief under the dormant Commerce Clause. Again, Defendants' challenge to the dormant Commerce Clause claim disregards the standard of review. It argues that the burden on interstate commerce was "miniscule" and that "Plaintiffs offer nothing to show that the [challenged restrictions] were somehow 'clearly excessive' in comparison to [their asserted benefits]." (**ECF No. 41-1, PageID.896-97**). However, at the pleading stage, Plaintiffs need only plead a plausible claim, not prove their case. Plaintiffs' dormant Commerce Clause claim satisfies that low threshold.

The "dormant" Commerce Clause restricts state regulation of the flow of interstate commerce. *Huish Detergents, Inc. v. Warren Co.*, 214 F3d 707, 712 (6th Cir. 2000), citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987). A state's regulation of interstate commerce is prohibited under the dormant Commerce Clause if it imposes a burden on interstate commerce that is "'clearly excessive in relation to the putative local benefits'" even in the absence of discrimination against out-of-state business interests in favor of in-state business interests.

*Huish Detergents, Inc. v. Warren Co.*, 214 F.3d at 713, citing *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 390 (1994) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). If a State's regulation interferes with interstate commerce in a manner that violates the dormant Commerce Clause, the regulation is invalid whether the challenging Plaintiffs are domiciled in-state or out-of-state. *See Comptroller of the Treasury v. Wynne*, 575 U.S. 542 (2015); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 336 (2008); *Granholm v. Heald*, 544 U.S. 460, 469 (2005).

The burden on both Plaintiffs' businesses and interstate commerce is readily apparent in this case. The EOs have shuttered Plaintiffs' gyms and fitness facilities and forced them to remain closed for the last four months. These closures are still indefinite in duration with no planned date to allow Plaintiffs to reopen their businesses. This has caused a devastating loss of revenue, as well as, in some instances, the permanent closure of gyms and fitness facilities. The losses  caused by the EOs have affected and continue to affect interstate commerce in that Plaintiffs' businesses have a number of visiting clients from out-of-state, and they are unable to take delivery of any purchased equipment and supplies from out-of-state businesses during this indefinite shutdown.

Defendants have predictably argued that this extreme, excessive burden is justified to control the spread of COVID-19, but Defendants have yet to cite any data that supports this contention. The EOs were originally issued under the auspices of "flattening the curve," but this goal has been met for at least two and a half months per the Governor's own admission.[31] As such, even if Defendants were to successfully argue that these heightened restrictions were necessary to flatten the curve at one time, that is no longer an appropriate justification by today's measures.

---

[31] *Michigan Governor Gretchen Whitmer Press Conference Transcript April 27*, available at https://www.rev.com/blog/transcripts/michigan-governor-gretchen-whitmer-press-conference-transcript-april-27 ("[A]nd so we've flattened it…" at 45:53) (last visited June 8, 2020).

It is worth reiterating at this point that "a burden on interstate commerce that had no rational justification would be invalid." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 556 (7th Cir. 2007) (internal citations omitted). As discussed above, Defendants have yet to provide *any* data-driven rational justification for the continued forced closings of Plaintiffs' businesses, and, issuing subsequent, contradictory EOs, Defendants have further eroded any specious argument they once had for a rational justification for these extreme measures. Plaintiffs have sufficiently pleaded that Defendants' actions were and continue to be excessive. Alternatively, whether the burden on interstate commerce was "miniscule," or whether the restrictions were "clearly excessive" are genuine issues of material fact. Therefore, Plaintiffs' viable dormant Commerce Clause claim should not be dismissed.

### F.    Plaintiffs' Void for Vagueness Claim is viable.

Plaintiffs have stated a viable claim for relief under the void for vagueness doctrines of both the United States Constitution and Michigan Constitution. The void-for-vagueness doctrine requires penal laws to define criminal conduct with sufficient precision that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender* v. *Lawson*, 461 U.S. 352, 357–358 (1983). This doctrine flows from the Due Process Clause. *Michigan Dep't of State Compliance & Rules Div.* v. *Michigan Educ. Ass'n*, 251 Mich. App. 110, 116 (2002); U.S Const., am. XIV; Mich. Const. (1963), art. I, § 17. The Lockdown Orders purport to carry the force of law and (with the exception of Director Gordon's Emergency Rule) makes any willful violation of their terms a misdemeanor punishable by imprisonment or a fine. It is therefore subject to the void-for-vagueness doctrine.

Defendants' disingenuously assert that there is nothing vague about the EOs, and that Plaintiffs understood whether or not they were (un)able to operate. Plaintiffs disagree. EO 2020-

42 through EO 2020-96 allow certain businesses to continue operations if they fall within certain "sectors" of the economy, but it does not identify any criteria by which a business owner can safely determine whether his or her business falls within that sector. Incongruities are evident within the orders.

The EOs have also included language that creates additional vagueness and confusion. For example, the EOs in question contain the following relevant language: "Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." (e.g. **ECF 33-12, 33-14, 33-16**). As outlined above, the EOs have, at a minimum, deprived Plaintiffs of liberty and property rights, including those under the Equal Protection, Dormant Commerce, Procedural Due Process, and Substantive Due Process Clauses. Despite these deprivations though, Defendants contend that the EOs are fully enforceable against Plaintiffs, and that Plaintiffs' violation of the EOs can lead to criminal and/or civil penalties. Undeniably, the EOs convey conflicting messages. Defendants are telling Plaintiffs that their Constitutional rights are fully protected, but also if Plaintiffs exercise those rights they will be subjected to criminal and/or civil penalties.

The arbitrary enforcement of these EOs has caused significant confusion as well. Despite active EOs calling for social distancing, Governor Whitmer herself stood shoulder to shoulder with protestors in Highland Park. (**ECF 33-17**) Upon information and belief, no criminal and/or civil penalties were levied against Governor Whitmer for blatant violations of her own EOs.

Finally, the very fact that the Governor needs dedicated webpages to answer a plethora of "frequently asked questions" about the scope of the order shows the inherent vagueness of these orders. Michiganders are smart people. If "ordinary people" could understand the Lockdown Order, then there would be no need for the ***1,002 FAQs*** answered on the State's coronavirus

webpage thus far.[32] The orders are also constantly being "clarified" in news articles, press conferences, videos, and revised orders.[33] Still, pervasive confusion remains each time a new order is released.

Based on the Complaint and the above, Plaintiffs have sufficiently pleaded that the EOs are vague, and encourage arbitrary and discriminatory enforcement. Alternatively, whether the EOs are vague, and encourage arbitrary and discriminatory enforcement are genuine issues of material fact. Therefore, Plaintiffs' viable Void for Vagueness claim should not be dismissed.

### G. Plaintiffs do not oppose dismissal of their Privileges and/or Immunities Claims.

Upon further review of Count II (Privileges and Immunities Clause) and Count III (Privileges or Immunities Clause), Plaintiffs do not object to or otherwise oppose their dismissal.

### CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion to Dismiss in its entirety.


Dated: July 16, 2020                    Respectfully submitted,

                                        /s/ Scott M. Erskine
                                        SCOTT M. ERSKINE (P54714)
                                        CARLY VAN THOMME (P59706)
                                        ERSKINE LAW, PC
                                        Attorneys for Plaintiffs
                                        612 West University Drive
                                        Rochester, Michigan 48307
                                        (248) 601-4497
                                        serskine@erskinelaw.com

---

[32] *See* Michigan.gov, *Frequently Asked COVID-19 Questions*, available at: https://www.michigan.gov/coronavirus/0,9753,7-406-98810---,00.html?page=1&limit=25&filterCategories=&searchQuery= (last visited July 14, 2020).

[33] E.g. *Michigan AG Dana Nessel Answers Questions Related to COVID-19 and Governor's Executive Orders*, MLive, https://www.youtube.com/watch?v=Ib09PFOKZ2I&feature=youtu.be (3/30/20, last accessed 7/15/20).

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of W.D. Mich. LCivR 7.3(b)(i) because this brief contains 10,791 words, excluding the parts of the brief exempted by W.D. Mich. LCivR 7.3(b)(i).

2.     This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Windows in 12-point Times New Roman font.

## PROOF OF SERVICE

I hereby certify that on July 16, 2020, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

s/ Scott M. Erskine_____
SCOTT M. ERSKINE (P54714)
CARLY VAN THOMME (P59706)
ERSKINE LAW, PC
Attorneys for Plaintiffs
612 West University Drive
Rochester, Michigan 48307
(248) 601-4497
serskine@erskinelaw.com
cvanthomme@erskinelaw.com